627 So.2d 878 (1993)
Craig HENDERSON, a minor, By and Through his mother and next friend, Linda HARTSFIELD
v.
ALABAMA POWER COMPANY.
ALABAMA POWER COMPANY
v.
Craig HENDERSON, a minor, By and Through his mother and next friend, Linda HARTSFIELD.
1901875, 1901946.
Supreme Court of Alabama.
June 25, 1993.
Rehearing Denied August 27, 1993.
*879 Joseph G. Pierce and Jack Drake of Drake & Pierce, Tuscaloosa, and Ralph I. Knowles, Jr. of Doffermyre, Shields, Canfield & Knowles, Atlanta, GA, for appellant/cross-appellee.
S. Allen Baker, Jr. and James A. Bradford of Balch & Bingham, Birmingham, and William J. Hust, Jr. of Zeanah, Hust, Summerford, Davis & Frazier, Tuscaloosa, and Forrest S. Latta of Pierce, Carr & Alford, Mobile, for appellee/cross-appellant.
Bruce J. McKee of Hare, Wynn, Newell & Newton, Birmingham, for amicus curiae Alabama Trial Lawyers Ass'n.
ADAMS, Justice.
Craig Henderson and Alabama Power Company ("APCo") appeal and cross appeal, respectively, from a judgment awarding Henderson $15,303.84 in compensatory damages, *880 but reducing to $250,000 a jury's $500,000 punitive damages award, in Henderson's personal injury action against APCo. We affirm in part, reverse in part, and remand.
In 1988, APCo owned and operated an "electrical transmission switching tower" near the Cedar Knoll and Idlewood residential subdivisions of Tuscaloosa, Alabama. The tower, which was constructed in 1957, supported a number of transmission lines carrying 44,000 volts of electricity. It was approximately 33 feet high and 5 feet square and was composed of vertical and horizontal steel bands reinforced by diagonal steel braces.
When initially constructed, the tower was fitted with an "anti-climbing guard"a barbed wire latticework enclosed within a square steel frame. This framework was installed horizontally on the tower midway between the base of the tower and the first series of wires. The width of the frame exceeded the width of the tower; thus, the barbed wire extended slightly beyond the tower on all four sides. In 1967, APCo attached to the toweroutside the guarda steel "switch operating rod," or pole, two inches in diameter.
On September 13, 1988, 12-year-old Craig Henderson and at least three other children climbed the tower, getting past the anti-climbing device by means of the switch operating pole. While Henderson was playing on the tower, his head contacted one of the power lines and the resulting electrical "flash" knocked him from the tower. He was transported by helicopter to the burn unit at the Children's Hospital in Birmingham, where he was treated for "deep second degree" burns to his face, thighs, and other parts of his upper body.
On November 23, 1988, Henderson, by and through his mother, sued APCo on counts alleging negligence and wantonness. The cause proceeded to trial, and, on May 23, 1991, the jury awarded Henderson $15,303.84 in compensatory damages and $500,000 in punitive damages. APCo moved for a judgment notwithstanding the verdict, or, in the alternative, for a new trial; and for a "remittitur, or, in the alternative, [a vacation of] the punitive damage[s] award." Henderson, in a "motion for [a] declaratory judgment and for entry of judgment in excess of $250,000," challenged the constitutionality of Ala.Code 1975, § 6-11-21, which, subject to enumerated exceptions, limits to $250,000 jury awards of punitive damages.
Following a post-verdict review of the damages award as required by Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), the trial court entered an order expressly finding that the jury's award was supported by clear and convincing evidence of wantonness and was not excessive. Although "acknowledg[ing] its continuing questioning of the constitutional [validity] of § 6-11-21," the trial court, nevertheless, reduced the punitive damages award to the statutory limitdeferring to this Court a resolution of the plaintiff's challenge to the constitutionality of the statute.
Both parties appeal the judgment, which was based on the jury's verdict and the trial court's ruling on the post-verdict motions. The dispositive issues on appeal, broadly stated, are whether the punitive damages award, which was based on the wantonness count, was supported by the evidence, and, if so, whether § 6-11-21 violates the constitution of Alabama.

I. Wantonness (Case 1901946)
Section 6-11-21 was enacted as part of a "package of bills" collectively called "the Alabama Tort Reform Act." L. Nelson, Tort Reform in Alabama: Are Damages Restrictions Unconstitutional? 40 Ala.L.Rev. 533, 533 (1989); Act No. 87-185, § 2, 1987 Ala. Acts 251. The section provides:
"An award of punitive damages shall not exceed $250,000.00, unless it is based upon one or more of the following:
"(1) A pattern or practice of intentional wrongful conduct, even though the damage or injury was inflicted only on the plaintiff; or,
"(2) Conduct involving actual malice other than fraud or bad faith not a part of a pattern or practice; or,
"(3) Libel, slander or defamation."
*881 Although Henderson contends that APCo's conduct falls within at least one of the first two statutory exceptions to the damages limitation, his contentions are unsupported by the evidence and must be rejected. We address, therefore, the broader question presented by APCo's motion for a new trial, that is, whether the jury's finding that APCo wantonly breached the duty owed to the plaintiff was against the weight of the evidence.
The duty owed to trespassing children by individuals and entities maintaining artificial conditions on land is set out by Restatement (Second) of Torts § 339 (1977). That section states:
"A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if
"(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and
"(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and
"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and
"(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and
"(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."
See also Tolbert v. Gulsby, 333 So.2d 129 (Ala.1976) (adopting § 339).
In adopting § 339, this Court recognized the special duty owing to a class of plaintiffs, defined in § 339(c), whose natural proclivity for wonder and adventure often exceeds their sense of impending danger. See Motes v. Matthews, 497 So.2d 1121 (Ala.1986). Whether a particular plaintiff falls within this class will ordinarily present a jury question. See Lyle v. Bouler, 547 So.2d 506 (Ala.1989).
APCo contends that § 339 "establishes a special `negligence' standard for the benefit of trespassing children." Brief of Appellant Alabama Power Company, at 54. It concedes, however, that the duty set forth in § 339 may also form the basis of a cause of action for wantonnesssubject to a "heightened knowledge" requirement. Id.[1]
This "heightened knowledge" requirement for wantonness has been defined as "the conscious doing of some act or the omission of some duty [while] under knowledge of existing conditions and while conscious that, from the doing of such act or the omission of such duty, injury will likely or probably result." Lewis v. Zell, 279 Ala. 33, 36, 181 So.2d 101, 104 (1965). Wantonness will be found where the evidence demonstrates "that with reckless indifference to the consequences [a party] consciously and intentionally did some wrongful act or omitted some known duty which produced the result." Id.
In the context of § 339, wantonness may be summarized as the defendant's conscious acts or omissions in the maintenance of an artificial condition on a place where the defendant knows children will likely trespass, accompanied by the awareness that they will thereby expose themselves to a high probability of injury. It need not be shown that the defendant specifically anticipated the trespass of the plaintiff, Tolbert, 333 So.2d at 134, but only that the defendant anticipated trespasses by members of the protected class to which the plaintiff belonged, and that such persons trespassing would thereby be exposed to a high risk of injury due to the defendant's acts or omissions. The defendant's knowledge, although the sine qua non *882 of wantonness, "may be made to appear like any other fact, by showing circumstances ... from which the fact of knowledge is a legitimate inference." Blount Brothers Constr. Co. v. Rose, 274 Ala. 429, 437, 149 So.2d 821, 830 (1962).[2]

A. Knowledge of Conditions
APCo argues that liability must be predicated on its knowledge that "children were likely to trespass on the transmission tower" involved in this case. In fact, the jury was so instructed at APCo's request. Reply Brief of Appellant Alabama Power Company, at 6 n. 1 (emphasis in original.) Henderson contends that this proposition mischaracterizes the duty set forth in § 339, and that the relevant "place" is the area of the easement in the vicinity of the tower. We need not resolve this issue, because APCo's awareness of the likelihood that children would attempt to climb the tower itself was clearly inferable from the evidence.
This evidence included, inter alia, testimony and documents demonstrating the extent of knowledge possessed by the utility industry generally. For example, Henderson introduced provisions of the National Electrical Safety Code, which in pertinent part provides:
"b. Climbing
"Readily climbable supporting structures, such as closely latticed poles or towers, including those attached to bridges, carrying open supply conductors energized at more than 300 volts, which are adjacent to roads, regularly travelled pedestrian thoroughfares, or places where persons frequently gather (such as schools or public playgrounds) shall be equipped with barriers to inhibit climbing by unqualified persons or posted with appropriate warning signs."
National Electrical Safety Code, § 280A.1.b. (1987) (emphasis added).
Henderson also presented the testimony of M.A. Martin, Jr., an electrical engineer, who for 18 years had engaged in equipment evaluation and research and development for Georgia Power Company. In response to questions from Henderson's counsel, Martin testified:
"Q. Do you have any basis for, in your engineering experience and your experience with Georgia Power, for saying that Alabama Power Company should have recognized that kids might well climb on this tower?
"A. Well, we have known for years that they do that. That is common knowledge.

"Q. That is not something that you have to [do] a good bit of investigation to determine, is it, Mr. Martin?
"A. Well, not unless you want to know specifically who is doing it.
"Q. And it really doesn't matter, does it, for purposes of safety?
"A. No."
(Emphasis added.)
In this connection, Martin read into evidence a bulletin issued in 1967 by the transmission department of Georgia Power dealing with public safety. Under the heading "Anti-climb Guards and Warning Signs for Steel Structures," the bulletin stated:
"The Georgia Power Company has an obligation to the public to take precautionary measures in heavily populated areas because of the dangers of unauthorized persons climbing the steel structures. The installation of anti-climb guards and warning signs are a means to accomplish this. These devices must be installed with considerable care and planning. Keep in mind that the character of neighborhoods changes rapidly. It is the purpose of this bulletin to establish certain guidelines for the installation of these devices."
Moreover, Henderson, through the testimony of APCo's own personnel, produced evidence of its subjective knowledge of these conditions. For example, Jimmy Oden, who since 1971 had engaged in the inspection and clearing of APCo's easements, knew that at least two residential subdivisionsCedar Knoll and Idlewoodadjoined and abutted *883 APCo's easement. He also knew that two footpaths crossed the easement in the vicinity of the tower, one of which was 15 feet to 20 feet from the tower.[3] Oden knew that the area's residents were using these paths, and he testified that children not infrequently walked and played on APCo's easements, stating that he "assumed" they were doing so in this case.
Perhaps the most notable evidence of APCo's knowledge, however, was the existence of the anti-climbing guard itself, which APCo had originally installed to prevent persons from climbing the tower. APCo's representatives thus stood before the jury in the awkward position of denying knowledge of the very eventualities that it had installed the anti-climbing guard to prevent. The jury was free to reject such reasoning, and apparently it did so.

B. Acts or Omissions
The blueprints for the construction of the Cedar Knoll tower required enclosure of all vertical bars and poles within the framework of the anti-climbing guard. Thus, as originally installed, the anti-climbing guard rendered the power lines atop the tower virtually inaccessible to unauthorized climbers. When APCo added the 2-inch steel pole to the tower in 1967, however, it did not incorporate the pole within the confines of the guard.
Regarding the effect of this "modification" on the effectiveness of APCo's anti-climbing precaution, Martin gave the following testimony:
"Q. [By counsel for Henderson]. Mr. Martin, have you reviewed the provisions in the National Electrical Safety Code ... to try to determine which sections would be applicable, if any, to a tower such as this one?
"A. Yes.
"Q. Did you make any determinations as to whether or not at the time Craig Henderson was injured on this tower, that that tower was either in compliance or not in compliance with the National Electrical Safety Code?
"A. Yes, sir.
"Q. What was your determination?
"A. My determination was that, strictly speaking, Alabama Power Company did a poor job of complying with the Code. But in my opinion, they did not comply with the intent of the Code.
"Q. And what do you mean by that?
"A. Well, they put a barrier up there, and it consisted of barbed wire. Their specification for doing that called for all of these poles that are running parallel to the tower and perpendicular to the ground to be within that barbed wire, but one of them was not. So, in that regard, they didn't follow their own guidelines. That left footholds and handholds available for young people to use and get around the barbed wire. So, the intent of the Code, in my opinion, was violated."
(Emphasis added.)
In response to Martin's statement of his opinion that the modification placed the design of the tower in noncompliance with APCo's own specifications, as well as with the intent of the National Electrical Safety Code, APCo contends that § 280A.1.b. requires only that towers, even those located in residential areas, be "equipped with barriers to inhibit climbing" or be "posted with appropriate warning signs." APCo, pointing out the fact that § 280A.1.b. contains the dis junctive, contends that the section thus allowed it to exercise discretion in deciding whether to install a guard or to post a sign.
APCo elicited some testimony that the anti-climbing guard, even after the addition of the switching pole, somewhat "inhibited" climbing. It also produced some testimony, although contradicted, that the tower was posted with a warning sign at the time of the accident. This evidence of compliance with the Code, APCo contends, shields it from liability. We disagree with this contention.
The applicable duty in this case is defined not by § 280A.1.b., but by Restatement *884 § 339. Furthermore, although the violation of a statutory standard may constitute negligence per se, Fox v. Bartholf, 374 So.2d 294 (Ala.1979), it does not follow that compliance with the "letter" of a statutory standard is nonnegligence per se. W. Keeton, D. Dobbs, R. Keeton, and D. Owen, Prosser and Keeton on the Law of Torts § 36, at 233 (5th ed.). Under the totality of the circumstances in a particular case, a defendant's conduct, although technically in compliance with a minimal standard, may be unreasonableeven so unreasonable as to constitute wantonness or willfulness. See Prosser and Keeton, at 233.[4]
Indeed, APCo's placement of the switching pole outside the anti-climbing guard may be analogized to the removal from machinery of a safety device provided by the manufacturer. In the context of actions by injured workers against co-employees, the legislature has included such a removal within its definition of "willful conduct"conduct exhibiting a greater degree of immoderation than wantonness. Ala.Code 1975, § 25-5-11(c)(2).
The portent of the tower's modification was augmented by the presence of "switching stools," wooden platforms that APCo had placed for the use of its linemen just below the switching pole. Richard Henderson, the plaintiff's brother, testified that these stools facilitated the children's access to the switching pole, the base of which was approximately three feet above the ground. He further testified to the ease with which the children reached the barbed wire framework by climbing the pole, and then, by stepping on the guard, gained access to the tower's unguarded upper regions. The plaintiff's evidence also demonstrated that it was feasible to secure the tower from such intrusions at minimal cost.
All this evidence supports the jury's conclusion that APCo maintained the Cedar Knoll tower in a condition that, it knew, posed a high probability of death or serious injury to the area's children. A "jury's verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of the motion for a new trial." Thorne v. C & S Sales Group, 577 So.2d 1264, 1267 (Ala.1991); Whisenant v. Nationwide Mut. Fire Ins. Co., 577 So.2d 909, 911 (Ala.1991). Consequently, the trial court did not err in denying APCo's post-trial motions. For the reasons explained above, and because we find no merit in other issues raised by the appellant APCo in its cross-appeal (number 1901946), the judgment, as to the issues raised in that appeal, is affirmed.

II. Constitutionality (Case 1901875)
Henderson contends that § 6-11-21 violates a number of provisions of the Alabama Constitution, in particular, Ala. Const. 1901, art. I, § 11, which provides: "That the right of trial by jury shall remain inviolate." This Court has held that the jury trial right protected by § 11 of the 1901 Constitution is the right as it existed at common law: "The right ... is confined to those classes of cases in which the right existed at common law, or in which it was used at the time of the adoption of the Constitution." Gilbreath v. Wallace, 292 Ala. 267, 270, 292 So.2d 651, 653 (1974), quoting Alford v. State ex rel. Attorney General, 170 Ala. 178, 188-89, 54 So. 213, 215-16 (1910) (Mayfield, J., dissenting).
This rule is merely a restatement of the principle declared in Thomas v. Bibb, 44 Ala. 721, 722 (1870): "[T]he right of trial by jury is confined to cases in which it was conferred by the common law, to suits which the common law recognized amongst its old and settled proceedings and suits, in which legal rights were to be ascertained and determined, in contradistinction to those in which equitable rights alone were recognized, and equitable remedies were administered, or in which was a mixture of law and equity." (Emphasis added) (citing Story on Const. § 1763; Tims v. State, 26 Ala. 165 (1855); Boring v. Williams, 17 Ala. 510 (1850)).
The essence of the common law is its "inherent capacity ... for growth and change." 15A Am.Jur.2d Common Law § 3 (1976). Its capacity to adapt to the changing needs of society depends on "judicial inventiveness." Id. Judicially created causes of action, such as the Alabama Extended Manufacturer's *885 Liability Doctrine, bad faith failure to pay an insurance claim, or willful violations of § 339 are part of the warp and woof of the common law and are, therefore, inherently within "those classes of cases in which the right [to a trial by jury as guaranteed by § 11] existed at common law." Gilbreath, 292 Ala. 267, 270, 292 So.2d 651, 653 (emphasis added). Such causes of action are, as explained by Thomas, clearly "legal" in nature, requiring a determination of fault and, most significantly"in contradistinction to those in which equitable rights ... were recognized"damages. Thus, in Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala. 1991), this Court held that Ala.Code 1975, § 6-5-544(b), which limited to $400,000 the amount of "noneconomic" damages recoverable in a medical malpractice action, violated the right to trial by jury as guaranteed by § 11.
Henderson insists that the disposition of this case is controlled by Moore. APCo, however, contends that the Code section here under review differs fundamentally from the statute invalidated in Moore, because § 6-11-21, unlike § 6-5-544(b), purports to regulate only punitive damages, which, APCo contends, are not constitutionally protected. It is therefore apparent that Moore controls the resolution of this issue unless the operational effect of § 6-11-21 differs substantially from the effect of § 6-5-544(b) or the species of damages addressed in § 6-11-21 necessitates a result different from the one reached in Moore. Because we address only rights arising under the Alabama Constitution, our conclusions regarding the constitutionality of § 6-11-21 are based entirely on adequate and independent state law grounds.
A. Operation of § 6-11-21
In Moore, we analyzed the operational effect of the damages limitation imposed by § 6-5-544(b). In doing so, we explained:
"Under the procedure mandated by § 6-5-544(b), a jury is empaneled and deliberates, with the expectation that its verdict will have efficacy, an issue of fact singularly within its authority. At the conclusion of deliberations, however, the trial judge is required summarily to disregard the jury's assessment of the amount of noneconomic loss, that species of damages lying most peculiarly within the jury's discretion. See Alabama Power Co. v. Mosley, 294 Ala. 394, 318 So.2d 260 (1975); Durham v. Sims, 279 Ala. 516, 187 So.2d 558 (1966); W.S. Fowler Rental Equipment Co. v. Skipper, 276 Ala. 593, 165 So.2d 375 (1963). To the extent that the assessment exceeds the predesignated ceiling, the statute allows no consideration for exigencies presented by each case. Such a requirement has no parallel in the jurisprudence of this state and is patently inconsistent with the doctrines of remittitur or new trial as we have applied them. See also Smith v. Department of Ins., 507 So.2d 1080, 1088-89 (Fla.1987) ("Nor, we add, because the jury verdict is being arbitrarily capped, is the plaintiff receiving the constitutional benefit of a jury trial as we have heretofore understood that right"). It is not relevant, under a § 11 analysis, that the statute has not entirely abrogated the right to empanel a jury in this type of case. The relevant inquiry is whether the function of the jury has been impaired. Because the right to a jury trial `as it existed at the time the Constitution of 1901 was adopted must continue "inviolate,"` the pertinent question `is not whether [the right] still exists under the statute, but whether it still remains inviolate.' Alford v. State ex rel. Attorney General, 170 Ala. 178, 197, 54 So. 213, 218 (1910) (Mayfield, Sayre, and Evans, JJ., dissenting). `For such a right to remain inviolate, it must not diminish over time and must be protected from all assaults to its essential guaranties.' Sofie v. Fibreboard Corp., 112 Wash.2d 636, 656, 771 P.2d 711, 722 (1989)."
Moore, 592 So.2d at 163-64 (footnote omitted.) We then concluded that such "automatic" and "absolute" limitations imposed on the jury's discretion rendered nugatory the jury's functionthereby destroying the essence of the right guaranteed by § 11.
Section 6-11-21, like § 6-5-544(b), does not abrogate any cause of action. See Moore, 592 So.2d at 165 (the "right to a trial by jury does not arise in the absence of a *886 cause of action requiring a finder of fact"). Instead, under the law as currently constituted, once the jury, which may be demanded by either party, is selected and empaneled, it is authorized to award every species of damagesincluding punitive damages. Sections 6-11-20 and -21; Moore, supra; Fuller v. Preferred Risk Life Ins. Co, 577 So.2d 878 (Ala.1991). Like § 6-5-544(b), § 6-11-21 requires the trial judge, after the jury has awarded a sum of punitive damages corresponding to its impression of the character of the defendant's conduct, to reduce automatically that portion of the verdict exceeding the predetermined statutory limit. We thus conclude that the operational effect of § 6-11-21 differs in no material respect from the mechanics of § 6-5-544(b).

B. Protectability of Punitive Damages
In support of its argument that punitive damages awards are not constitutionally protected, APCo cites Alabama Power Co. v. Rembert, 282 Ala. 5, 208 So.2d 205 (1968); Treadwell Ford, Inc. v. Leek, 272 Ala. 544, 133 So.2d 24 (1961); Lehigh Portland Cement Co. v. Sharit, 234 Ala. 40, 173 So. 386 (1937). The principle expressed in these cases, however, upon close analysis, forecloses the rule that APCo proposes.
In Rembert, Leek, and Sharit, the issue was whether the trial court had properly instructed the jury on the question of the plaintiff's interest in punitive damages. In each case, this Court held that the challenged charge was erroneous in that it unconstitutionally impaired the discretion of the jury to award punitive damages.
More specifically, in Rembert, the jury was instructed "that it should assess punitive damages against appellants if appellants were guilty of wantonness." 282 Ala. at 6, 208 So.2d at 205 (emphasis in original.) On appeal, this Court stated: "The trial court erred in directing the jury that it `should' assess punitive damages, and the failure to leave such assessment to the discretion of the jury has been held to be reversible error." (Citing Sharit, supra). Similarly, in Leek, this Court held that a challenged jury charge "was erroneous in that it assert[ed] that [the] plaintiff would be entitled to recover punitive damages under the circumstances hypothesized in the charge." 272 Ala. at 546, 133 So.2d at 25. This Court again explained that the infirmity of the charge was its failure to leave the imposition of punitive damages to the sound discretion of the jury. Id. Thus, if the jury's discretion was unconstitutionally impaired by these instructions, which, in effect, directed the jury to award punitive damages, then a fortiori, a statute interdicting such damages is patently impermissible.
Justice Houston's dissent in this case criticizes the foregoing discussion of Rembert, Leek, and Sharit. The dissent's analysis, however, is faulty and its criticism of our reasoning is misdirected. Although it correctly observes that each of those cases contains the statement, "Punitive damages are not recoverable as a matter of right except as provided by statute" (emphasis by Justice Houston), it misapprehends the purpose for which they are here cited. In particular, Justice Houston omits the second sentence of the pertinent quotation from Sharit:
"Punitive damages are not recoverable as a matter of right, except as provided by the statute. The imposition of such damages in cases where compensatory damages is the measure of recovery may be by the jury, in its sound discretion, imposed for aggravated wrongs. Louisville & Nashville Railroad Co. v. Bizzell, 131 Ala. 429, 30 So. 777; Birmingham Electric Co. v. Shephard, 215 Ala. 316, 110 So. 604."
234 Ala. at 43, 173 So. at 388 (emphasis added).
"The cases hold that punitive damages are not recoverable as a matter of right, but their imposition is discretionary with the jury, acting with regard to the enormity of the wrong and the necessity of preventing similar wrongs."
Birmingham Elec. Co. v. Shephard, 215 Ala. 316, 318, 110 So. 604, 605 (1926) (emphasis added; citations omitted).
"The oral charge is furthermore faulty in asserting that plaintiff would under given circumstances be entitled to recover punitive damages. Such damages being apart from compensation are not recoverable as a matter of right. Their imposition is discretionary *887 with the jury, acting with regard to the enormity of the wrong and the necessity of preventing similar wrongs.1 Brick.Dig. 523, § 16; S. & N. A. R.R. Co. v. McLendon, 63 Ala. 266."
Louisville & N. R.R. v. Bizzell, 131 Ala. 429, 437, 30 So. 777, 780 (1901) (emphasis in original; other citations omitted).
In none of the three cases cited was the Court addressing a statute making punitive damages recoverable as a matter of right. Sharit, in which the Court first made the statement, cited only two cases, which do not include any reference to a statute. Indeed, Sharit actually says "except as provided by the statute," 234 Ala. at 43, 173 So. at 388 (emphasis added). If the Court had a particular statute in mind, it did not say so. Such a statute would probably violate the right to jury trial in the opposite direction from the invasion committed by § 6-11-21. Leek merely repeats the statement from Sharit, omitting "the," and Rembert merely repeats the statement from Leek.
Obviously, these cases are not cited herein for any proposition that punitive damages are recoverable as a matter of right, but only for the proposition that a legislative prohibition against a jury's awarding punitive damages in its sound discretion is subject to a challenge similar to the objection to a trial court's instruction that a jury "should" award punitive damages. Just as a trial court cannot insist that a given jury "should" award punitive damages, the legislature cannot prohibit juries from awarding an amount commensurate to the wrongdoing shown by the evidence in a particular case. A fair reading of Moore reveals that its holding rested on this principle. Such a reading also reveals that the present issue was, in fact, there decided sub silentio.
Section 6-5-544(b) expressly included punitive damages within the class of damages subject to the $400,000 limitation. This Court invalidated in toto the damages limitations provisions of subsection (b)including the limitation on punitive damagesas violative of § 11. Moore, supra, at 164. If punitive damages awards are, as APCo contends, not constitutionally protected, this Court would have expressly excluded from its holding and rationale that portion of subsection (b) limiting such awards. See Fuller v. Preferred Risk Life Ins. Co., 577 So.2d 878, 884 (Ala.1991) (in a case in which punitive damages are permitted, "[o]nce a jury is demanded by either party, the jury has the constitutional authority to determine what amount, if any, of punitive damages is necessary to punish a defendant for wrongful conduct and to deter future conduct of a like nature").
Of course, because Moore was addressing a statute that limited both compensatory and punitive damages, there was no need for the Court to address punitive damages separately. Section 6-5-544 limited the recovery of damages for "pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium and other nonpecuniary damage," as to which a plaintiff clearly has a vested, individual right to challenge the violation of the right to jury trial. There was no suggestion in Moore that the Court should rewrite § 6-5-544 to make it a limitation on punitive damages alone if the Court found that the limitation on nonpecuniary compensatory damages violated the plaintiff's right to jury trial. Therefore, the punitive damages limitation fell along with the compensatory damages limitation, and there was no need in Moore to decide whether punitive damages were subject to the same analysis. Because that argument is made here and addressed in Justice Houston's dissent, we will answer it now.
The question may be seen as, Was the jury used in punitive damages cases when the Constitution was adopted? Was the right of trial by jury in existence as to punitive damages at that time? The answer to these questions is clearly "yes."
"Where the injury is to the person of the plaintiff, the amount of damages cannot be measured by any certain and precise standard. The negligence may be very gross and reprehensible, and in all such cases the jury may give smart money, if in their view the circumstances are such as to require it."
Rhodes v. Roberts, 1 Stew. 145, 146-47 (Ala. 1827) (emphasis added).

*888 "[T]he court charged the jury that ... if the defendants after the [plaintiff's lawful entry onto the land] removed the trees and fence from the land against the plaintiff's consent, the jury were bound to find against such of them as were concerned in it the actual damage caused by such removal, and they had the right, if they thought proper to exercise it, to give the plaintiff vindictive damages.
"....
"... The law in cases attended with circumstances of aggravation, allows the jury to give exemplary damages.Sedg. on Dam. 39-487. The case of Merest v. Harvey, 5 Taunt. 442, (marg. page,) was an action of trespass quare clausum fregit. No actual damage was sustained by the owner of the land, yet the jury gave £500 and the court refused to disturb the verdict, holding that the jury properly imposed exemplary or punitory damages."
Mitchell v. Billingsley, 17 Ala. 391, 392-94 (1850) (emphasis added).
"Wherever there is a wrongful taking of the property of another, or a wrongful injury done to it, the law implies that the owner has sustained some damage; and although there be in fact no sensible damage from the loss or injury of the property, or from an actual deprivation of its use, the owner is entitled to recover some damages. And if the trespass on the property was accompanied by circumstances of aggravation, `smart money,' or `exemplary damages,' may be assessed by the jury, although the property itself had no pecuniary value."
Parker v. Mise, 27 Ala. 480, 483 (1855) (emphasis added; citations omitted).
"For an injury resulting from mere negligence, only compensation can be recovered. But, when the negligence is so gross as to show willfulness, wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, then punitive or exemplary damages may be awarded, in the sound discretion of the jury.
"....
"... It depends on the degree of the negligence, whether simple or gross; and the jury are judges of the degree, under proper instructions from the court; and the application of the rule must always depend, more or less, on the circumstances of the case."
South & North Alabama R.R. v. McLendon, 63 Ala. 266, 274-75 (1879). See also, e.g., Louisville & Nashville R.R. v. Whitman, 79 Ala. 328 (1885); Ala. Great Southern R.R. v. Frazier, 93 Ala. 45, 9 So. 303 (1891); Ala Great Southern R.R. v. Sellers, 93 Ala. 9, 9 So. 375 (1891).
The manner in which punitive damages were viewed in the late 19th century can be seen from the opinion of the United States Supreme Court in Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729 (1886). In that case, a Federal circuit court, sitting as a trial court, had sustained a plea to the jurisdiction of the court, on the theory that the actual damages suffered by the plaintiff did not meet the court's jurisdictional threshold of $500, and dismissed the action. The plaintiff alleged that he had attempted to pay the defendant tax collector with bonds issued by an earlier Virginia legislature, but that the tax collector had willfully refused the payment and had seized the plaintiff's horse to sell at public auction, knowing the bonds to be valid debts of the state. The taxes due were $59.15 and the horse was worth $125. The Supreme Court held that the allegations of the complaint and the prayer for $6000 damages presented a question for the jury as to the amount of damages, and that the trial court encroached upon the province of the jury in holding that the facts alleged in the complaint would not support a verdict sufficient to meet the jurisdictional threshold. Although the cause of action would support an award of noneconomic damages, e.g, damages for injury to the plaintiff's reputation and credit, the Court based its reversal on the right to have a jury award punitive damages. Because the discussion in Barry v. Edmunds is so enlightening, and because it collects numerous pertinent authorities of the time, we quote it at length:
"It is quite clear that the amount of the taxes alleged to be delinquent, for nonpayment of which the seizure was made, is immaterial. It is equally clear that the *889 plaintiff is not limited in his recovery to the mere value of the property taken. That would not necessarily cover his actual, direct, and immediate pecuniary loss. In addition, according to the settled law of this court, he might show himself, by proof of the circumstances, to be entitled to exemplary damages calculated to vindicate his right and protect it against future similar invasions. `It is a well-established principle of the common law,' said Mr. Justice Grier in Day v. Woodworth, 13 How. 362, 371 [Dec.Term 1851],[[5]] `that, in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offense rather than the measure of compensation to the plaintiff. We are aware that the propriety of this doctrine has been questioned by some writers; but, if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument.... [elipses in Barry] In actions of trespass, where the injury has been wanton and malicious or gross and outrageous, courts permit juries to add to the measured compensation of the plaintiff, which he would have been entitled to recover had the injury been inflicted without design or intention, something further by way of punishment or example, which has sometimes been called "smart money." This has always been left to the discretion of the jury, as the degree of the punishment to be thus inflicted must depend on the peculiar circumstances of each case.' In The Amiable Nancy, 3 Wheat. 546 [4 L.Ed. 456] [1818], which was the case of a marine tort, Mr. Justice Story spoke of exemplary damage[s] as `the proper punishment which belongs to such lawless misconduct.' In Tracy v. Swartwout, 10 Pet. 80, 95 [9 L.Ed. 354] [1836], it was said that `where a ministerial officer acts in good faith, for an injury done he is not liable to exemplary damages;' and this implies its converse, when his acts are not only illegal, but wanton, willful, malicious, and oppressive. In Philadelphia, Wilmington & Baltimore Railroad Co. v. Quigley, 21 How. 202, 214 [16 L.Ed. 73] [1859], Mr. Justice Campbell said: `Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations.' In Milwaukee & St. Paul Railway Co. v. Arms, 91 U.S. 489, 492 [23 L.Ed. 374] [1875], the rule was said to apply to actions on the case, for injuries arising from the negligence of the defendant. `Redress commensurate to such injuries,' said Mr. Justice Davis, delivering the opinion of the court, `should be afforded. In ascertaining its extent, the jury may consider all the facts which relate to the wrongful act of the defendant and its consequences to the plaintiff; but they are not at liberty to go farther, unless it was done willfully, or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them. In that case the jury are authorized, for the sake of public example, to give such additional damages as the circumstances require. The tort is aggravated by the evil motive, and on this rests the rule of exemplary damages.' In Missouri Pacific Railway Co. v. Humes, 115 U.S. 512, 521 [6 S.Ct. 110, 113, 29 L.Ed. 463] [1885], Mr. Justice Field said: `It is the duty of every State to provide, in the administration of justice, for the redress of private wrongs; yet the damages which should be awarded to the injured party are not always readily ascertainable. They are in many cases a matter of conjectural estimate, in relation to which there may be great differences of opinion. The general rule undoubtedly is that they should be precisely commensurate with the injury. Yet in England and in this country *890 they have been allowed in excess of compensation whenever malice, gross neglect, or oppression has caused or accompanied the commission of the injury complained of.' In the English Court of Common Pleas, it was held, in the case of Bell v. Midland Railway Co., 10 C.B.N.S. 287 [1861], that, where a railway company had obstructed a siding belonging to an adjoining landowner with a high hand and in violation of his rights under an act of Parliament, exemplary damages might justly be given. And the rule was applied in Emblem v. Myers, 6 H. & N. 54, against one who negligently and recklessly pulled down buildings on his own land so as to injure his neighbor with a view to make him give up possession. In that case Baron Bramwell said: `If a plaintiff, in his particulars, claimed £500 because the defendant walked over his lawn the jury might award that amount if they thought it was done for the purpose of annoyance and insult.' In Johnson v. Hannahan, 3 Strobhart, 425 [1849], the Court of Appeals of South Carolina, in an action of trespass quare clausum fregit, where the plaintiff sought to recover damages for an invasion of his close, accompanied, as he alleged, by circumstances of oppression and insult, refused to set aside a verdict for $3000, as excessive, although the actual and mere pecuniary loss, it was shown, did not amount to $20. In Kolb v. Bankhead, 18 Texas, 228, which was an action of trespass for cutting down and carrying off timber from the land of another, where the defendant had wilfully or by gross negligence cut over his own line on the land of the plaintiff, it was said by the Supreme Court of Texas, that, `in estimating the damages the jury were not confined strictly to mere compensation for the timber cut and removed. It was their right to look to the particular circumstances of the case, and give such damages as the facts were deemed by them to warrant, and as would, in their judgment, be adequate, not only for compensation, but also for prevention.'
"It is unnecessary, however, further to multiply authorities on this point. The precedents are indefinite in number, and the application of the rule as uniform as the circumstances of the cases are various. There was clear error in the Circuit Court in its ruling, as [a] matter of law, that there could be no lawful recovery, in such a case as that stated in the declaration, of an amount equal to that which is necessary to support the jurisdiction of the court. The same error was repeated in acting upon the statement, that a verdict, if rendered for that amount, would be excessive and set aside for that reasona statement which could not, at any rate, be judicially made before such a verdict was in fact rendered. It adds, indeed, to the principal error, if any distinction can be made, that which consists in encroaching upon the province of the jury. For nothing is better settled than that, in such cases as the present, and other actions for torts where no precise rule of law fixes the recoverable damages, it is the peculiar function of the jury to determine the amount by their verdict. In Whipple v. The Cumberland Manufacturing Co., 2 Story, 661, 670, Mr. Justice Story well expressed the rule on this subject, that a verdict will not be set aside in a case of tort for excessive damages `unless the court can clearly see that the jury have committed some very gross and palpable error, or have acted under some improper bias, influence or prejudice, or have totally mistaken the rules of law by which the damages are to be regulated'that is, `unless the verdict is so excessive or outrageous,' with reference to all the circumstances of the case, `as to demonstrate that the jury have acted against the rules of law, or have suffered their passions, their prejudices, or their perverse disregard of justice to mislead them.' In no case is it permissible for the court to substitute itself for the jury, and compel a compliance on the part of the latter with its own view of the facts in evidence, as the standard and measure of that justice, which the jury itself is the appointed constitutional tribunal to award."
116 U.S. 550, 562-65, 6 S.Ct. 501, 508-09 (1886) (footnote added) (emphasis in original).
Just as it was improper for the trial court in Barry "to substitute itself for the jury ... *891 as the standard and measure of that justice, which the jury itself is the appointed constitutional tribunal to award," 116 U.S. at 565, 6 S.Ct. at 509, it is improper for the legislature to substitute itself for the jury and to fix an arbitrary, predetermined limit of "that justice, which the jury itself is the appointed constitutional tribunal to award." Because the above discussion shows that juries awarded punitive damages just as they did nonpecuniary compensatory damages before the adoption of the Constitution of 1901, the discussion in Moore regarding the application of § 11 is equally applicable to both kinds of damages.
The case of Meighan v. Birmingham Terminal Co., 165 Ala. 591, 51 So. 775 (1910), is cited in the dissent for the propositions that "[e]xemplary damages are in no case a right of the plaintiff" and that "[t]he state [has] the right to remit punitory damages." 165 Ala. at 599, 51 So. at 778. At 909. These statements were made more strongly than was necessary to the decision of the opinion. The legislation in question had simply approved, after the fact, the taking by the Terminal Company of portions of Sixth Avenue. The Court held that, in light of this and other facts shown, the trial court did not err in dismissing the count alleging a wanton and willful taking, which added to the other counts only the possibility of punitive damages. The first statement, that exemplary damages are not a right of the plaintiff, is consistent with other cases, such as Rembert, Leek, and Sharit, supra,[6] to the effect that punitive damages are discretionary with the jury. As we stated above, the plaintiff does not have a right to receive punitive damages in the same sense that a defendant does not have a right to avoid them: the matter is discretionary with the jury. The second statement from Meighan, that the state had the right to remit punitive damages, is not therein supported by any authority, but seems to be an attempt at extending the principle that punitive damages are imposed on behalf of society to prevent such wrongs.
The dissent's interpretation of Meighan results, in part, from its misreading of Ala. Const.1901, § 104(28). Section 104 is not a specific directive to the legislature to act in the instances enumerated, as the dissent would have it, but a prohibition against enacting special, private, or local laws on the 31 subjects listed. Although the last sentence of the section states that "[t]he legislature shall pass general laws for the cases enumerated in this section," this statement cannot be construed to mean that the legislature must pass general laws on all the subjects in the list to accomplish the things that cannot be done by special or private laws. On the contrary, § 104 was clearly designed principally to end legislative responsibility in many of the areas mentioned.
The first item on the list of prohibited private laws is "granting a divorce." Article VI, § 13, of the 1819 Constitution had provided:
"Divorces from the bonds of matrimony shall not be granted but in cases provided for by law, by suit in chancery: and no decree for such divorce shall have effect until the same shall be sanctioned by two-thirds of both houses of the general assembly."
The requirement of legislative approval was removed from the 1861 Constitution (Art. VI, § 13), but it is clear that the memory of the provision of the 1819 Constitution was behind the prohibition of Const.1901, Art. IV, § 104(1).
Similarly, § 104(5) prohibits a special, private, or local law "Incorporating a city, town, or village." In the early days of statehood, this was a major function of the legislature. Toulmin's Digest of The Laws of the State of Alabama (1823), includes 75 Acts of the territorial and early state legislatures on the subject of "Towns," with most of those acts establishing, incorporating, or changing the names of towns and cities. Before the 1901 Constitution was adopted, this practice had been abandoned (see, e.g., Code 1876, §§ 1763-1768), but, again, the historical practice *892 of legislative incorporation of cities is what is prohibited by § 104(5).
Directly on the point at issue, the early legislatures had passed private laws remitting fines and penalties against named individuals. See, e.g., the Act "For the relief of John M'Shan and William M'Shan, of Jefferson county":
"Section 1. Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That the Sheriff of Jefferson county be, and he is hereby, authorized and required, to suspend the collection of a forfeiture of one hundred dollars each, entered up against John M'Shan and William M'Shan, of said county, at September term one thousand eight hundred and twenty-one, as security for William M'Shan, to prosecute John Henry and others for a breach of the peace.
"Section 2. And be it further enacted, That the said John M'Shan and William M'Shan be, and are forever discharged and exonerated from the payment of the aforesaid fine of one hundred dollars each."
1821 Ala. Acts, p. 110. By Act No. 394 of the 1857-58 Alabama legislature, Austin Murphree, sheriff of Blount County, was "released from all liabilities and penalties he may have incurred from his failure to make returns of the election for Governor in the year 1857, all laws to the contrary notwithstanding." The index to the 1857-58 Alabama Acts shows approximately 60 "Relief Acts" for the benefit of named individuals; 473 Acts were passed by that legislature. Not many of the relief acts were remittances of fines, penalties, and forfeitures, but most of them fit within one of the prohibitions listed in § 104. The passage of numerous such relief acts persisted until the adoption of the Constitution of 1875, after which their number dwindled rapidly and the category disappeared from the index of the Acts in 1882-83.
The Constitution of 1875 included several generalized prohibitions against special or local laws: Art. IV, §§ 23, 24, and 25. These apparently proved insufficient to stop the practice, because the legislature continued to pass acts for the benefit of individuals. For example, although the Acts of 1882-83 contain no index topic of "relief acts," such acts were passed, such as Act No. 261, for the relief of John Rupert, circuit clerk of Escambia County. Thus, the itemized prohibitions were included in § 104 of the 1901 Constitution.
The point here is not that the legislature cannot pass general acts remitting fines, penalties, and forfeitures. Rather, the point is that § 104 is not so much a specific authorization to pass such general acts as a prohibition against private acts on the subject. Thus, the point stressed by the dissent (quoting Jefferson County v. Braswell, 407 So.2d 115, 119 (Ala.1981)) that specific provisions of the Constitution prevail over more general provisions, can be seen to be completely irrelevant here.
More pertinent here is the principle that, if two provisions of the Constitution are seen to conflict, and one of them is contained in Article I, the Declaration of Rights, the provision from the Declaration of Rights will prevail. State ex rel. Galanos v. Mapco Petroleum, Inc., 519 So.2d 1275, 1277 (Ala. 1987), quoting In re Dorsey, 7 Port. 293, 359 (Ala.1838). Of course, §§ 11 and 104(28) do not conflict, because the latter is not a specific grant of a right to remit fines, penalties, and forfeitures, but is a limitation on the legislative power, just as § 11 is. Nor does the last sentence of § 104 conflict with § 11, because that sentence should not be read as a directive to enact general laws on the subjects enumerated. If it were read as specific authorization for general laws remitting fines, penalties, or forfeitures, it would also specifically authorize general laws "Granting a divorce" and "Incorporating a city, town, or village," neither of which makes any sense. Thus, the last sentence of § 104 can be read only as a statement of the legislature's plenary power to enact general laws not otherwise prohibited.
In light of the above discussion, the statement in Meighan that "the state had the right to remit punitory damages," 165 Ala. at 599, 51 So. at 778, is not only unsupported by, but is contrary to, § 104(28). Moreover, the holding in Meighan was correct regardless *893 of the passage of the act ratifying the Birmingham Terminal Company's taking of the streets in question. The opinion states:
"There is no pretense that the changes made in the streets, avenues, and alleys of the city, a number of which were involved, were in excess of the necessary and appropriate completion of the general design of serving the convenience of the public and the carriers who were expected to make use of the terminal station. The defendant, without doubt, acted under the authority and in accordance with the direction of the constituted municipal authorities. No circumstance of insult or aggravation is shown, but only the fact that the ordinance of the city under the authority of which the work was done, in so far as it authorized the vacation or abandonment of some parts of streets and avenues, was void because it had not express legislative authority."
165 Ala. at 598, 51 So. at 777. This alone was sufficient to support the affirmance of the trial court's judgment based on an affirmative charge for the defendant on count two, which would have allowed the recovery of punitive damages: the plaintiff did not present any evidence that would support an award of punitive damages. The remainder of the paragraph, quoted by the dissent, was unsupported by any citation except a citation to Sedgwick on Damages for the irrelevant proposition that a claim for punitive damages did not survive the death of the wrongdoer.
Whether Meighan was rightly or wrongly decided on this point, it should not be taken as meaning that the Legislature can violate or diminish the jury's historic, constitutionally preserved function of punishing egregiously wrongful conduct by the imposition of punitive damages in civil actions. Such damages have long been imposed by the jury according to its sound discretion and according to its findings as to the degree of the wrong and the amount of damages necessary and appropriate as punishment. Thus, a limitation on punitive damages such as that imposed by § 6-11-21 clearly impairs the traditional function of the jury.
In performing this function, the jury is an institution of the body politic. In a jury, citizens exercise direct democracy, whereas the legislature consists of representatives of the people, exercising the people's power and doing their will only indirectly. The jury serves as the conscience of the community. It acts in particular cases, whereas the legislature makes rules for general classes of situations. Legislation cannot take into account the particular circumstances of a particular wrong.
This Court, in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), articulated, clarified, and refined the common law mechanism of remittitur, so as to protect defendants on a case by case basis from verdicts so excessive or out of proportion to the wrong or to the individual defendant as to violate the defendant's right not to be deprived of property without due process of law. A legislative act that is not so particularized is a grave imposition on the discretion that has always been given to juries.
Such a limitation could properly be imposed by constitutional amendment, in which the people exercise direct democracy, just as they do when they serve on juries. If the people, as amenders of their constitution, wish to limit their power as jurors, they can do so. Section 11 of the Constitution reserves this power of the people out of the powers granted to the legislature.
With regard to Justice Houston's assertion that the majority is exercising its will, not its judgment, in holding § 6-11-21 unconstitutional in this case, we say only this: In our considered opinion and judgment, the constitutional protection of the right to jury trial imposed by § 11, and the consequent limitation on legislative power, are much broader, deeper, and more important than Justice Houston would have them be.[7] Thus, we *894 hold that § 6-11-21 is unconstitutional. The judgment, to the extent that it reduced and remitted to $250,000 the jury's punitive damages award, is reversed, and the cause is remanded with directions to reinstate the full amount of the verdict.
1901946 (Part I)AFFIRMED.
MADDOX, ALMON, SHORES, KENNEDY and INGRAM, JJ., concur.
HOUSTON and STEAGALL, JJ., dissent.
HORNSBY, C.J., recused.
1901875 (Part II)REVERSED AND REMANDED WITH DIRECTIONS.
ALMON, SHORES, KENNEDY and INGRAM, JJ., concur.
MADDOX, HOUSTON and STEAGALL, JJ., dissent.
HORNSBY, C.J., recused.
MADDOX, Justice (concurring in part; dissenting in part).
I concur in the majority's conclusion that there was sufficient evidence of wantonness to present a jury question on that issue, but I must respectfully disagree with the majority's conclusion that the legislative act setting a limit on punitive damages at $250,000 is unconstitutional.
The right to trial by jury is one of the basic constitutional rights that we all cherish, and the people, in their Constitution, have specifically said that the right shall remain inviolate. If the issue in this case involved the substantive right of this plaintiff to a trial by jury composed of 12 persons, or the substantive right to a unanimous verdict, I would join the majority, as I did in Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), a case cited by my colleagues in which the legislature sought to establish a six-person jury instead of a 12-person jury, but this case is not about the right of a party to have a jury determine the factual issues in a case; it is about a more serious question of the role of the judiciary and the legislature in the development of tort law. Specifically, it is about the role of the judiciary when interpreting a duly enacted act of the legislature that establishes a limit on the amount of punitive damages that can be awarded in a civil case.
The majority's conclusion is based upon a proposition of law never before decided in this State, insofar as I knowthat a civil jury possesses more power and right to decide the amount of penalty to assess against a civil wrongdoer than the duly elected representatives of the people. My colleagues say:
"In performing [its function of awarding punitive damages] the jury is an institution of the body politic. In a jury, citizens exercise direct democracy, whereas the legislature consists of representatives of the people, exercising the people's power and doing their will only indirectly. The jury serves as the conscience of the community. It acts in particular cases, whereas the legislature makes rules for general classes of situations. Legislation cannot take into account the particular circumstances of a particular wrong."
At 893. (Emphasis in original.)
This holding, I believe, establishes a new and dangerous principle of democratic government that is foreign to any concept of democratic rule with which I am familiar. If the principle should be extended to other cases, both civil and criminal, it would have the effect of allowing a jury to supplant the will of the people, as expressed through their duly elected legislators, with respect to the fixing of penalties, whether civil or criminal, and could raise some very serious questions as to the validity of any legislative act that would alter the role of juries in civil or criminal cases as that role existed when the Alabama Constitution of 1901 was adopted.
In striking down the cap statute, the holding also has other repercussions. It removes one of the underpinnings that I believe *895 caused the United States Supreme Court to approve Alabama's procedures for reviewing punitive damages awards in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). In Haslip, the Court, in footnote nine, noted: "The Alabama Legislature recently enacted a statute that places a $250,000 limit on punitive damages in most cases. See 1987 Ala. Acts, No. 87-185, §§ 1, 2, and 4 [Sec. 2 of Act 87-185 is Ala.Code 1975, § 6-11-21, which the majority declares to be unconstitutional]. The legislation, however, became effective only on June 11, 1987, see § 12, after the cause of action in the present case arose and the complaint was filed." 499 U.S. at 20, 111 S.Ct. at 1044 n. 9.[8]
The act this Court strikes down was passed by a legislature that has been reapportioned as provided by the United States Constitution to guarantee and protect the rights of all its citizens, including its corporate citizens, one of which is a defendant in this case. The act was part of the so-called "Tort Reform Package," which was debated for numerous legislative days, and there were numerous compromises and amendments adopted during its passage through the legislature. See Robert D. Hunter, Alabama's 1987 Tort Reform Legislation, 18 Cumb.L.Rev. 281 (1987-88) (detailing some of the history of the legislation).
The wisdom of this legislation was vigorously challenged at the time it traveled through the legislature, and there were disagreements about various provisions. I do not address the wisdom of the act; there may be some inherent inequities in placing a cap of $250,000 on the award of punitive damages, especially when a tort-feasor's conduct is especially egregious. The legislature, making a policy choice, has made some exceptions for conduct to which the cap would not apply. When this act was being debated in the House and the Senate, the legislature heard all the arguments for and against the placing of caps, and another legislature, composed of different representatives and senators, might reach a different conclusion than did the legislature that passed this act. If so, those legislators could repeal it, and that would be their prerogative, but whatever is done, either by this Court, or by the legislature, must comport with guidelines that are being established by the United States Supreme Court to accord due process of law to civil defendants when punitive damages are awarded against them.

The Role of the Judiciary
As I view this case, the crucial issue is a constitutional question of the role of the judiciary when a legislative act is challenged as violating fundamental law, either state or federal. Because the issue in this case involves the assessment of punitive damages, the act must be reviewed not only to make sure that it comports with Alabama's fundamental law, but also to make sure that a defendant's federal due process rights are also considered.
There are certain principles that have long been a part of this State's jurisprudence that I believe should be applied in determining whether the cap statute violates state or federal fundamental law. I state them now and will expound on their meaning and apply them to the particular facts of this case later in this opinion:
(1) The Alabama Constitution provides for a separation of powers between the legislative, executive, and judicial branches, with the legislature having full power to deal with the award of punitive damages;
(2) Courts uniformly recognize that the power to declare a legislative act unconstitutional is a delicate one, to be used with great caution; that the power of our legislature is as plenary as that of the British Parliament; and that in passing upon the constitutionality of a legislative act, it is the recognized duty of courts to sustain the act unless it is clear beyond reasonable doubt that it violates fundamental law; yet, my colleagues seemingly start with the *896 opposite presumptionthat jury verdicts, reached by jurors selected by the litigants in a civil law suit, who exercise a standardless discretion in fixing the amount to be awarded, can override a duly enacted law of the legislature;
(3) The legislature has the power to regulate the award of punitive damages in civil cases without violating § 11 of the Constitution, because § 11 applies only to the substantive right of a party to have a jury in a legal action, and the legislature, in the exercise of its police power, can change or modify the common law, if done for the public good, and can absolutely deal with the imposition of penalties, whether criminal or civil; and
(4) Jury awards of punitive damages that are made without the jury's having any standards or guidelines can "cross the line into the area of constitutional impropriety," Haslip, 499 U.S. at 24, 111 S.Ct. at 1046, and establishing a limit on the award of punitive damages is congruent with federal constitutional rights of defendants not to be penalized except by due process of law.
On several other occasions, I have expressed my view of the role of this Court when reviewing legislation that is alleged to violate the Alabama Constitution. See Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 178-83 (Ala.1991) (Maddox, J. dissenting); Clark v. Container Corp. of America, 589 So.2d 184, 201-02 (Ala.1991) (Maddox, J., dissenting); Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414, 423-27 (Ala.1991) (Maddox, J., dissenting); see also Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812, 824-29, 833-34 (Ala.1988) (Maddox, J., concurring in part; dissenting in part); Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d 334, 355-58 (Ala.1981) (Beatty, J., dissenting, joined by Maddox, J.); Grantham v. Denke, 359 So.2d 785, 789-92 (Ala.1978) (Maddox, J., dissenting); Bagby Elevator & Electric Co. v. McBride, 292 Ala. 191, 200-08, 291 So.2d 306 (1974) (Maddox, J., dissenting). I could end this dissenting opinion by referring to the views I expressed in those opinions, but my belief in the plenary power of the legislature, when exercised in a manner congruent with the due process guaranteed by the United States Constitution, is so strong that I am compelled to express the reasons for my disagreement, believing, as Thomas Jefferson did, and as I have written before, that "each judge should write an opinion in every case so as to `throw himself in each case on God and country; both will excuse him for error and value him for honesty.'" McBride, 292 Ala. at 200, 291 So.2d at 314 (Maddox, J., dissenting) (quoting 32 J.Am.Jud.Soc'y, at 106). Throwing myself on God and country, and believing firmly that my view of legislative power in this case is the correct one, I set forth, once again, why I think the Court errs in striking down this statute that limits the recovery of punitive damages to $250,000.

The Constitution of Alabama Provides for a Separation of Powers Between the Legislative, Executive, and Judicial Branches
One of the first principles of democratic government that young school children learn is that the legislature makes the law, the executive enforces the law, and the judiciary interprets the law. That principle of democratic government, the separation of powers doctrine, is at the very foundation of a government of the people, for the people, and by the people, and is included in the Alabama Constitution of 1901.
Ala. Const.1901, § 43 provides:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
Id. (Emphasis added.)
I believe that my colleagues, in allowing for the recovery against this defendant of punitive damages in excess of the maximum amount fixed by the legislature, have implicitly held that the judicial branch of government is the only branch that can determine *897 what constitutes a civil wrong and the recoverable damages for that wrong. Although I agree with much of what my colleagues say about the role of common law judges in developing the law of torts, and although I voted to create the cause of action, not available in 1901, that permitted this plaintiff, a trespasser, to sue in this case, see Tolbert v. Gulsby, 333 So.2d 129 (Ala.1976), I cannot accept the proposition that the legislature is powerless to legislate, as has in effect been held here, in setting a limit on the recovery of punitive damages in a tort action, whether it existed in 1901 or was created later.

Courts Should not Declare a Legislative Act Unconstitutional Unless it is Clear Beyond Reasonable Doubt that the Act Violates Fundamental Law
I recognize that courts have the power, and indeed the duty, to declare an act of the legislature void if it offends the fundamental law of the people, provided, of course, the constitutionality of the act is properly and timely challenged by a party having standing to sue. As I view the law, however, courts are required to apply the following principles of law before striking down a duly enacted law of the legislature:
"Uniformly, the courts recognize that this power [to declare a legislative act unconstitutional] is a delicate one, and to be used with great caution. It should be borne in mind, also, that legislative power is not derived either from the state or federal constitutions. These instruments are only limitations upon the power. Apart from limitations imposed by these fundamental charters of government, the power of the legislature is as plenary as that of the British Parliament. It follows that, in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of fundamental law. State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 186 So. 487, 121 A.L.R. 283."
Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 814-15 (1944). (Emphasis added.)
Several times in recent years I have been compelled to disagree with this Court's striking down of a legislative act as violating either § 11 or § 13 of the Constitution, and in each case I thought that the Court failed to apply this uniform principle of law that guides us when a legislative act is questioned on constitutional grounds. See Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 178-183 (Ala.1991) (Maddox, J. dissenting); Clark v. Container Corp. of America, 589 So.2d 184, 201-02 (Ala.1991) (Maddox, J., dissenting); Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414, 423-27 (Ala.1991) (Maddox, J., dissenting); see also Grantham v. Denke, 359 So.2d 785, 789-92 (Ala.1978) (Maddox, J., dissenting); and Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d 334 (Ala.1981) (Beatty, J. dissenting, joined by Maddox, J.). In his dissenting opinion in Fireman's Fund, Justice Beatty quoted from McAdory the following passage, which I believe is uniquely applicable here:
"`[The police] power must not be exercised arbitrarily or capriciously, and there must be some reasonable relation to the regulations and the ends to be attained. But if upon the matter men may reasonably differ, in view of all the circumstances, the legislative act in the exercise of the police power must be sustained.'"

Fireman's Fund, 394 So.2d at 357 (quoting McAdory, 246 Ala. at 13, 18 So.2d at 818). (Emphasis added in Fireman's Fund.)
It seems such a basic principle of law that it is the legislative branch of government that has the power to decide the amount of penalty that can be imposed for wrongful conduct, whether that wrongful conduct is criminal or civil, especially when the legislative branch is acting in a manner that is congruent with federal constitutional requirements of due process of law in the imposition of punitive damages. It also seems, therefore, that there could be no question as to the right of the legislature to limit the amount of *898 punitive damages fixed by a jury in a civil case.
The majority believes that the Alabama Constitution does not authorize the legislature to remit a punitive damages award. Admittedly, no specific constitutional provision grants the legislature power to remit "punitive damages," as such, but punitive damages serve punitive goals, Day v. Woodworth, 54 U.S. (13 How.) 363, 14 L.Ed. 181 (1851), and "the labels `criminal' and `civil' are not of paramount importance." United States v. Halper, 490 U.S. 435, 447, 109 S.Ct. 1892, 1901, 104 L.Ed.2d 487 (1989). "It is well settled that a penalty imposed by law may be remitted by the legislature, and that a legislature may remit penalties under a general law even if the state constitution forbids remission of penalties by special law." 36 Am.Jur.2d Forfeitures and Penalties, § 110, at 677 (1968) (citing Maryland v. Baltimore & O. R.R., 44 U.S. (3 How.) 534, 11 L.Ed. 714 (1845)). It would seem, therefore, to be settled that the prohibition in § 104(28) of the Constitution against the legislature's remission of fines by local, special, or private law does not prohibit the legislature from enacting a general act, to remit a fine. Cf. Jones v. Williams, 121 Tex. 94, 45 S.W.2d 130 (1931). Furthermore, if "punitive damages" are, in fact, a "fine," as they obviously are, then Amendment 38 to the Constitution, although generally applying to the remission of fines in criminal cases, specifically provides that "[t]he legislature shall have power to provide for and to regulate the administration of ... remission of fines and forfeitures...."

The Legislature has the Power to Regulate the Award of Punitive Damages Without Violating a Person's Right to Trial by Jury
The excessiveness of punitive damages awards has been a question that this Court, the United States Supreme Court,[9] and the legislature have addressed on several occasions in the last two decades. As jury awards of punitive damages increased, this Court was increasingly faced with requests to reduce jury verdicts on the ground that they were excessive.[10]
My colleagues cite Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), in support of their opinion that the legislature could not adopt this act because in 1901 this plaintiff would have been entitled to have a jury determine the amount of punitive damages to award. I participated in the Gilbreath decision, and I cannot accept the broad scope that my colleagues give it. Gilbreath involved a question of whether the legislature could authorize the convening of a six-person jury in a will contest, not the power of the legislature to address what it perceived to be a social evil. Gilbreath involved a question of the size of a common law jury and the question whether a verdict had to be unanimous. If this case involved an act of the legislature *899 that permitted juries of fewer than 12 persons or permitted less than unanimous verdicts in negligence actions like this one, then I would vote, as I did in Gilbreath, to hold that the legislature did not have that power. I voted in that case for that proposition only after I had read the 1901 Constitutional Convention debates and realized that the delegates had discussed at length the ideas of having juries of fewer than 12 and of allowing less than unanimous verdicts. The debates of the Constitutional Convention do not support the proposition that the Convention considered jury verdicts to be sacrosanct. In fact, the opposite was true. Much of the debate centered on trying to prevent jury fraud in the factfinding process; therefore, Gilbreath does not address the issue presented in this casethe right of a common law jury to exercise an unbridled discretion to award punitive damages. Consequently, any statement in Gilbreath directed at an issue other than the one presented in that case, whether the legislature could provide for a six-person jury, is pure dictum. My vote in Gilbreath was limited to the sole proposition that, if a party was entitled to a trial by jury at common law or if the right was given by statute, then the 1901 Constitution preserved to that party the right to a 12-person jury and a unanimous verdict. If I thought that Gilbreath held that everything was frozen as of 1901, as the majority concludes here, I would have filed a special concurrence in that case to state specifically the limits of my concurrence. In Gilbreath, the Court was dealing only with the "substance of [the right to trial by jury]." 292 Ala. at 269, 292 So.2d at 652. (Emphasis in original.) The Court said:
"It is well settled that the legislature may confer the right of trial by jury in actions in which the right did not previously exist. See Stevenson v. King, 243 Ala. 551, 10 So.2d 825 (1942). Having conferred such a right, the legislature has the power to abolish that right."
292 Ala. at 269, 292 So.2d at 652. (Emphasis added.)
If the legislature can confer a right of trial by jury that did not exist, can it not limit that right, provided it is exercising a power granted to it by the people? It would seem that it could, because this Court has held that the legislature can even abolish a cause of action entirely. Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939).[11]
I recognize that this class of cases, even though created by this Court, was one in which a trial by jury was authorized at common law, and I agree with my colleagues that at the time the 1901 Constitution was adopted, a jury could award punitive damages and could fix the amount in this class of cases.[12] However, the amount of punitive damages that a jury could award has always been subject to judicial review,[13] and one of the reasons for that judicial review is to protect defendants against unjust and unconstitutional awards made by juries. Consequently, it has always been accepted that jury verdicts are revisable. The only question *900 is whether the repository of power to revise a jury verdict is the courts, or whether the legislature can establish the limit of any penalty a jury can impose. I do not think that the judiciary is the only repository of the power to review, alter, and revise a jury verdict. I think that the people have left great powers to the legislature, including the power to place a cap on the amount of any penalty that a citizen will have to pay; that judicial power to strike down what the legislature has done is very delicate; and that courts should not strike down an act unless convinced that the legislature did not have the power to enact it, or that it acted arbitrarily or capriciously. It is at that point that my view of legislative power versus judicial power conflicts with that of the majority.

Jury Awards Made Without the Jury's Having Any Standards or Guidelines Can Cross the Line into the Area of Constitutional Impropriety
The majority seeks to justify its action by stating that "[t]his Court, in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), articulated, clarified, and refined the common law mechanism of remittitur, so as to protect defendants on a case-by-case basis from verdicts so excessive or out of proportion to the wrong or to the individual defendant as to violate the defendant's right not to be deprived of property without due process of law," At 893, and seems to believe that the question of the excessiveness of a punitive damages award is a judicial concern only, and that the legislature is powerless to limit the amount that can be awarded. Although I recognize that in Haslip the United States Supreme Court held that Alabama's procedure for reviewing jury awards of punitive damages "ensures meaningful and adequate review by the trial court," 499 U.S. at 20, 111 S.Ct. at 1044, and that "the Alabama Supreme Court provides an additional check on the jury's or trial court's discretion," 499 U.S. at 20, 111 S.Ct. at 1045, I believe that the Supreme Court, by noting the cap statute in a footnote, would not necessarily approve the procedure as comporting with federal due process requirements, if the cap statute was stricken down as it is.[14]
*901 In view of these questions regarding the State's right, through the legislative process to impose outer limits on punitive damage awards, I believe the footnote in the Haslip takes on added significance.
The Alabama procedure for reviewing the alleged excessiveness of a jury award, although approved in Haslip, may not be the last word from the Supreme Court, because that Court may decide a case this term, see TXO Production Corp. v. Alliance Resources Corp., cert. granted, ___ U.S. ___, 113 S.Ct. 594, 121 L.Ed.2d 532 (1992), in which the question of the excessiveness of a punitive damages award by a West Virginia court is specifically presented. Hopefully, the Supreme Court will provide state courts with additional guidance, so that we can better determine the fundamental rights of both plaintiffs and defendants in cases involving awards of punitive damages.[15]
In recent years, many states have enacted statutes that cap or otherwise limit damages recoverable in personal injury actions. See Leonard J. Nelson, Tort Reform in Alabama: Are Damages Restrictions Unconstitutional? 40 Ala.L.Rev. 533, 549 n. 119 (1989). Clearly, the last word has not been spoken on state legislative caps of damages and their relation to federal due process rights. Recently, two other courts upheld statutes very similar to the one at issue today. Gordon v. State, 608 So.2d 800 (Fla. 1992); Wackenhut Applied Technologies Center v. Sygnetron Protection Systems, 979 F.2d 980 (4th Cir.1992). The United States Supreme Court has heard arguments in TXO Production Corp., and the search for constitutional standards goes on. See Volz, Punitive Damages and the Due Process Clause: The Search for Constitutional Standards, 69 U.Det.L.Rev. 459 (1992).

The Legislature Has Plenary Power to Regulate the Imposition of Penalties and Has the Power to Remit Them
The provision of the Alabama Constitution guaranteeing the right to trial by jury should not override the legislative power to remit penalties, also granted by the same Constitution, or the power of the legislature to exercise the police power of the State; provided, of course, that there is a rational basis for remitting penalties or exercising the police power. The right of the legislature to remit punitive damages, I thought, was not seriously questioned. See Meighan v. Birmingham Terminal Co., 165 Ala. 591, 598-99, 51 So. 775, 777-78 (1910). I note that my colleagues seem to think that Meighan does not address the power of the legislature to deal with punitive damages. Of course, I think they are wrong, because, as I have already shown, the question of excessive verdicts has been a concern of this Court, the legislature, and the United States Supreme Court.
My colleagues quote extensively from Barry v. Edmunds, 116 U.S. 550, 562-65, 6 S.Ct. 501, 507-09, 29 L.Ed. 729 (1886), in support of the result they reach, but the portion of the opinion that they quote, specifically recognizes, in two places, that jury verdicts are subject to a "precise rule of law [that] fixes the recoverable damages." The act that my colleagues invalidate is just such a "precise rule of law [that] fixes the recoverable damages." The particular quote I refer to reads as follows:
"For nothing is better settled than that, in such cases as the present, and other actions *902 for torts where no precise rule of law fixes the recoverable damages, it is the peculiar function of the jury to determine the amount by their verdict. In Whipple v. The Cumberland Manufacturing Co., 2 Story, 661, 670, Mr. Justice Story well expressed the rule on this subject, that a verdict will not be set aside in a case of tort for excessive damages `unless the court can clearly see that the jury have committed some very gross and palpable error, or have acted under some improper bias, influence or prejudice, or have totally mistaken the rules of law by which the damages are to be regulated'...."
116 U.S. at 565, 6 S.Ct. at 509.
My colleagues say that "[j]ust as it was improper for the trial court in Barry `to substitute itself for the jury ... as the standard and measure of that justice, which the jury itself is the appointed constitutional tribunal to award,' 116 U.S. at 565, 6 S.Ct. at 509, it is improper for the legislature to substitute itself for the jury and to fix an arbitrary, predetermined limit of `that justice, which the jury itself is the appointed constitutional tribunal to award.'" At 891. I fail to see how the legislature, in adopting a limit on the amount of penalty that can be imposed for wrongful conduct, is substituting itself for the jury. On the contrary, it has provided a "precise rule of law [fixing] the recoverable damages," such as the Supreme Court mentions in Barry v. Edmunds. In any event, Barry v. Edmunds must be read in the light of the developments in the last two decades of the law relating to the recovery of punitive damages.

Conclusion
This dissent is probably much too long, and I probably should have just cited the reader to the other dissents that I have previously written in which I have stated the law that ought to govern this Court's review, but I have written at length because of the depth of my conviction of the soundness of both the doctrine of separation of powers and the plenary power of the legislature to pass laws that the legislature considers to be in the public interest.
From the time of this Court's creation until its decision in Grantham v. Denke, 359 So.2d 785 (Ala.1978), this Court had steadfastly recognized the plenary power of the legislature to establish the public policy of the State. Grantham v. Denke was an aberration, representing a basic departure from the rule that had been embedded in the jurisprudence of this Statethat the legislature had the power to address what it perceived to be a social evil. I dissented in Grantham, for the same reasons I dissent today. Applying the principle of law I believe to be applicable, I am not convinced beyond reasonable doubt that the legislature violated fundamental law in capping punitive damages as it did. On the contrary, I believe that the views I have expressed in various dissents on this issue are sound, and in view of the fact that the United States Supreme Court upheld Alabama's review process, and in doing so, cited approvingly the act that today is obliterated, I can only believe that the majority's reasoning is seriously flawed.
I end my writing with this quote of the law:
"[T]he courts do not hold statutes invalid because they think there are elements therein which are violative of natural justice or in conflict with the court's notions of natural, social, or political rights of the citizen, not guaranteed by the constitution itself. Nor even if the courts think the act is harsh or in some degree unfair, and presents chances for abuse, or is of doubtful propriety. All of these questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decide is one of power, not of expediency or wisdom. 11 Am.Jur. pp. 799-812; A.F. of L. v. Reilly, District Court of Colorado, 7 Labor Cases No. 61,761."
Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9-10, 18 So.2d 810, 815. (Emphasis added.)
*903 HOUSTON, Justice (dissenting).

NO SUBSTANTIAL EVIDENCE OF WANTONNESS
Alabama Power Company filed a motion for a directed verdict at the close of the plaintiff's case and also at the close of all the evidence, asserting as one ground for the motion that the evidence adduced by the plaintiff on his claim of wantonness was insufficient. The trial court denied these motions and submitted both the negligence claim and the wantonness claim to the jury, which returned a verdict for the plaintiff. Alabama Power timely moved for a judgment notwithstanding the verdict, or, in the alternative, for a new trial, asserting as one of the grounds that there was insufficient evidence to submit the wantonness claim to the jury. Because I believe that there was substantial evidence of negligence to submit that claim to the jury but insufficient evidence of wantonness to submit the wantonness claim to the jury, I would reverse and remand under the authority of Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981).
The claim of wanton misconduct should not have been submitted to the jury unless there was substantial evidence ("evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved," West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); Ala.Code 1975, § 12-21-12) that Alabama Power consciously did some act or omitted some duty under knowledge of existing conditions and that Alabama Power was conscious that from doing the act or omitting that duty an injury would likely or probably result. Stone v. Southland National Insurance Corp., 589 So.2d 1289 (Ala.1991); Kelley v. Smith, 581 So.2d 1096 (Ala.1991). "[L]ikely" is defined as "[l]ogically or expectedly about to occur; imminent." The American Heritage Dictionary of the English Language, 757 (1969). "[P]robably" is defined as "[m]ost likely; in all probability; presumably." The American Heritage Dictionary of the English Language, 1043 (1969).
The plaintiff had the burden of proof. The standard for reviewing the denial of a motion for a directed verdict is whether the party with the burden of proof has produced substantial evidence of the elements of his claim so as to require a jury's determination. Alabama Great Southern R.R. v. Jackson, 587 So.2d 959, 962 (Ala.1991). Likewise, we must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable inferences from the evidence as the jury would be free to draw. Springer v. Jefferson County, 595 So.2d 1381, 1383 (Ala. 1992).
In 1988, Craig Henderson, age 12, was injured when he and two older friends, without permission, climbed an electrical switching tower owned and maintained by Alabama Power Company within an easement owned by Alabama Power Company. The easement bordered the rear of lots in Cedar Knoll, a residential subdivision, on one side and bordered woods and a corn field on the other side. The tower was a five-foot by five-foot vertical structure with steel-latticed supports and was approximately 33 feet high. The purpose of the tower was to allow Alabama Power to switch the direction or flow of electric power under emergency situations. There was an anti-climbing barricade made of barbed wire mesh installed on the tower, approximately 13 feet above the ground. This barricade extended outward from the tower approximately 18 inches on all four sides. The tower was constructed in 1957. There were two switching poles incorporated within the anti-climbing barricade when the tower was erected. In 1967, the tower was modified to include a third switching pole to provide a tap to another location. The switching pole was a smooth metal pole two inches in diameter with no handles or footholds to facilitate climbing. It was located three inches to six inches from the outermost strand of barbed wire on the anti-climbing barricade.
Alabama Power had no knowledge that children had been climbing the tower. The only evidence that children had climbed the tower before Craig's injury was evidence that Craig and his 14-year-old brother had climbed the tower, for the first time, approximately two weeks before the accident.
*904 Between 75 and 100 feet from the tower there was a path that crossed under the transmission line and permitted persons to walk from the neighborhood through the woods to Bowers Park, approximately a mile away. This path was separated from the tower by thick underbrush. A much less conspicuous path came within 10 to 15 feet of the tower. An adjacent landowner maintained a garden on the right-of-way near the tower.
There was a wooden step less than a foot from the ground on which Alabama Power personnel would stand when it was necessary to turn the switching poles to switch the direction or the flow of power.
Craig pulled himself up the two-inch metal switching pole for more than 13 feet until he could put his feet on the top of the anti-climbing barricade.
Fair-minded persons in the exercise of impartial judgment could reasonably infer from all the evidence that employees of Alabama Power breached the duty of due care stated in § 339, Restatement (Second) of Torts, by placing the switching pole where it was placed and outside the anti-climbing barricade. Therefore, there was substantial evidence to justify the submission of the negligence claim to the jury. Motes v. Matthews, 497 So.2d 1121, 1123 (Ala.1986); Torbert v. Gulsby, 333 So.2d 129, 132-35 (Ala.1976).
Could fair-minded people in the exercise of impartial judgment reasonably infer that the employees of Alabama Power were conscious that children would likely or probably pull themselves up the two-inch smooth metal pole, which was located within three to six inches of a strand of barbed wire, to a height of more than 13 feet so that they could step on the top of the barbed wire anti-climbing barricade? I think not. This pole had been in existence for more than 20 years when the injury occurred. Time alone would refute the idea that injury is likely to or probably will occur from the construction of the pole. There was no evidence of any attempts by children to climb this pole during this 20-year period until two weeks before the injury occurred. There was no knowledge on the part of Alabama Power Company that children had ever attempted to climb this pole prior to Craig's injury. There was no evidence of a change in the area surrounding the pole to establish that injury would likely or probably occur. Therefore, there was no substantial evidence of wantonness; and Alabama Power's motion for a judgment notwithstanding the verdict should have been granted as to the claim of wantonness.
When punitive damages are sought in a wantonness claim, as they were in this case, the plaintiff has the burden of proving "wantonness" as defined in Ala.Code 1975, § 6-11-20(a), (b)(3), by "clear and convincing evidence" as defined in § 6-11-20(b)(4), to recover punitive damages. "Clear and convincing evidence" is a standard of proof greater than "substantial evidence." Berry v. Fife, 590 So.2d 884, 887 (Ala.1991), Ala.Code 1975, § 6-11-20(b)(4). Therefore, because in my opinion, there was no substantial evidence of wantonness, there certainly was no "clear and convincing" evidence of wantonness to justify an award of punitive damages. Berry v. Fife, supra.

CONSTITUTIONALITY OF THE "CAP" ON PUNITIVE DAMAGES
"At Runnymede, at Runnymede, Your rights were won at Runnymede! No freeman shall be fined or bound, Or dispossessed of freehold ground, Except by lawful judgment found And passed upon him by his peers. Forget not, after all these years, The Charter signed at Runnymede."[1]
In 1215 at Runnymede, King John sealed Magna Carta, thereby creating or preserving two concepts of governance that protect individual liberty: representative democracy and trial by jury.
I could fill the book in which this dissent appears with praises for both concepts, but this is not the occasion to write a Te Deum for representative democracy or trial by jury; this is a time to rationally decide if these two concepts, whereby free people are to be governed, are in conflict. I do not believe that they are.
*905 If I believed that Ala.Code 1975, § 6-11-21, unconstitutionally deprived a plaintiff, who seeks punitive damages, of a right to trial by jury guaranteed by § 11 of the Alabama Constitution, then I would join the majority opinion and vote to hold the act unconstitutional, knowing full well that in doing so I was opening Pandora's box even further than the original majority opinion (which I incorrectly joined) did in Ex parte Coker.[2]
I believe that the legislature was specifically empowered by the Alabama Constitution to enact § 6-11-21 (Art. IV, § 104(28) Constitution). What is now § 6-11-21 was a general act, and it remits penalties; therefore, the legislature had the express constitutional authority to enact it.
I believe that the legislature was specifically empowered by the Constitution to enact Chapter 5 of Title 13A of the Code (Ala.Code 1975, §§ 13A-5-1 through 13A-5-59), "Punishments and Sentences." What is now §§ 13A-5-1 through 13A-5-59 was a general act, and it regulates punishment of crimes, which the legislature was specifically empowered to do by Art. IV, § 104(14).
However, if the legislature did not have the power to remit penalties by virtue of § 104(28), then the legislature had no power to take away the jury's right to sentence a defendant for murder in the first and second degree, manslaughter, rape, and numerous other offenses by virtue of § 104(14); and all sentences to death, imprisonment, and fines imposed for murder, manslaughter, rape, robbery, and many other offenses that occurred after 12:01 A.M. on July 1, 1981 (§ 13A-5-57), are unconstitutional under § 11 of the Alabama Constitution.
When the Constitution of 1901 was ratified, the power was expressly conferred in juries to impose the sentence of death or life imprisonment for defendants found guilty of murder in the first degree (Ala.Code 1897, § 4858); to impose the term of imprisonment for defendants found guilty of murder in the second degree (§ 4858), manslaughter (§ 4862), rape (§ 5444), robbery (§ 5479), and other offenses (§§ 5050, 4420, 4758); and to fix and determine the amount of the fine that a convicted felon had to pay (§ 5415). Section 1205 of Act No. 607, Acts of Alabama 1977 (now codified at Ala.Code 1975, §§ 13A-5-1 through 13A-5-59), removed from the jury the right to sentence and to fix and determine the amount of fines.
The right to trial by jury guaranteed by § 11 of the Alabama Constitution is confined to those classes of cases in which the right existed at common law or by statutory law at the time of the adoption of the Constitution of 1901. Gilbreath v. Wallace, 292 Ala. 267, 270, 292 So.2d 651, 653 (1974) (all Justices concurring); Miller v. Gaston, 212 Ala. 519, 103 So. 541 (1925); In re One Chevrolet Automobile, 205 Ala. 337, 87 So. 592 (1921); Alford v. State ex rel. Attorney General, 170 Ala. 178, 54 So. 213 (1910). The concept of the constitutional right to trial by jury, extending to those cases to which that right existed by statutory law at the time of the adoption of the most recent Constitution, predated the Constitution of 1901. See Tims v. State, 26 Ala. 165 (1855). This is consistent with the way in which the common law grew in this country. See Manoukian v. Tomasian, 237 F.2d 211, 215 (D.C.Cir.1956).[3]
Just as the Constitution specifically empowered the legislature to enact § 6-11-21, the Constitution empowered the legislature to enact §§ 13A-5-1 through 13A-5-59. See Art. IV, § 104(14), Constitution.
If, as the majority holds, the right to trial by jury divested the legislature of the right to remit penalties, which the jury had the discretionary right to fix at common law, then by the same reasoning the right to trial by jury divested the legislature of the power *906 to deprive the jury of the right to impose sentences for those criminal offenses as to which the jury had the exclusive right to impose sentence at the time of the ratification of the 1901 Alabama Constitution.
Even knowing the potential disaster that the majority opinion could cause, the majority refuses to consult the Official Proceedings of the Constitutional Convention of 1901 to examine the delegates' comments and thereby to envision the legislative power to "pass general laws for the cases enumerated in this section." Art. IV, § 104, Constitution. The delegates to the Constitutional Convention of 1901 clearly recognized that the legislature had the power to "remit ... penalties" and that the legislature had the power to "fix punishment for crimes"; and the delegates clearly believed that they were ensuring that the legislature would retain those powers under the new Constitution. As even a cursory examination of the Official Proceedings of the Constitutional Convention of 1901 shows, § 104 was viewed as a necessary restriction on the legislature's plenary power to enact laws dealing with the remission of penalties. The evil sought to be eliminated by § 104 was the legislature's propensity to enact laws that were not of interest to the state as a whole. According to Emmett O'Neal (a delegate from Lauderdale County and chairman of the Committee on Local Legislation and later Governor of Alabama, 1911-1915), local, special, or private laws were condemned because they "destroy the harmony of the law, consume the time of the legislature, obscure in the eyes of members of the General Assembly the importance of general laws, furnish opportunity for perpetuating jobs, [and] inflict injustice on individuals or localities in the interest of a favored few." Id. at 1799. After much debate over its scope and wording, the delegates finally adopted § 104 so as to require the legislature to exercise its power to remit penalties and to regulate punishment for crime only through the enactment of laws of statewide application. However, to eliminate any doubt as to whether the legislature would retain the power to legislate with respect to the 31 subjects specifically enumerated in § 104, the delegates approved the following language in the last paragraph of § 104: "The legislature shall pass general laws for the cases enumerated in this section." That this language was intended to be an express grant of power to the legislature is no more clearly illustrated than by the following exchange between Mr. O'Neal and delegate W.T. Sanders, a fellow member of the Committee on Local Legislation:
"MR. SANDERS: I desire to ask the gentleman a question. If the Legislature should refuse to pass a general law for the subjects enumerated in this Section, would not the members thereof thereby violate their oath to support the Constitution?
"MR. O'NEAL: Yes sir.
"MR. SANDERS: It is not optional with them, but is it not a command for them to pass a general law?
"MR. O'NEAL: In answer to the gentleman from Limestone, by reading the whole section it will be seen that it is made the absolute duty of the General Assembly to pass general laws on every subject as to which they are prohibited from passing local laws. You take up this whole list and while the Legislature is forbidden to pass local laws on these subjects, they are required if this section is adopted to pass a general law covering the subjects. They would violate their oaths if they did not do so."
Id. at 1799-1800. There does not appear to be any hint in the minutes of the Official Proceedings that any of the delegates considered any other provision of the Constitution to be a restriction on the legislature's express power to remit penalties or to regulate punishment under § 104.
What are punitive damages? "Punitive" is defined as "[r]elating to punishment; having the character of punishment or penalty; inflicting punishment or a penalty." Black's Law Dictionary 1234 (6th ed. 1990). "Penalty" is defined as "[a]n elastic term with many different shades of meaning; it involves the idea of punishment, corporeal or pecuniary, or civil or criminal, although its meaning is generally confined to pecuniary punishment...." Black's Law Dictionary, supra, at 1133. Thus, punitive damages are a form of civil penalty." `The imposition of punitive *907 or exemplary damages ... cannot be opposed as in conflict with the prohibition against the deprivation of property without due process of law. It is only one mode of imposing a penalty for the violation of duty, and its propriety and legality have been recognized....'" Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 16, 111 S.Ct. 1032, 1042, 113 L.Ed.2d 1 (1991), quoting Minneapolis & St. Louis R.R. v. Beckwith, 129 U.S. 26, 36, 9 S.Ct. 207, 210, 32 L.Ed. 585 (1889). Punitive damages have historically been awarded for the sole purpose of vindicating and protecting society's (i.e., the public's) right to be free from certain kinds of egregious tortious conduct, not for the purpose of providing a private compensatory remedy. See Meighan v. Birmingham Terminal Co., 165 Ala. 591, 51 So. 775 (1910). In Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812, 837 (Ala.1988), this Court noted:
"Although not imposing the stigma of crime or the unique burdens of imprisonment, punitive damages nonetheless serve to place the defendant on notice that it has engaged in conduct considered intolerable by society and also serve to deter others from following the defendant's example. But in levying a punitive award, the degree or amount must be comparable to the act deserving punishment. And though the defendant has engaged in intolerable conduct, it does not surrender its right to `fair' punishment; in other words, `although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence.' Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), citing Maryland Casualty Co. v. Tiffin, 537 So.2d 469 (Ala.1988), City Bank of Alabama v. Eskridge, 521 So.2d 931 (Ala. 1988), and Roberson v. Ammons, 477 So.2d 957 (Ala.1985)."
"Remit" means "[t]o give up; to pardon or forgive; to annul; to relinquish as to remit a fine, sentence, or punishment." Black's Law Dictionary, supra, at 1294. In The Oxford Thesaurus American Edition, 417 (1992), synonyms for "remit" are "abate, diminish, slacken, decrease, lessen, subside, alleviate, mitigate, assuage, ebb, dwindle, reduce, relax, ease." The power "to remit ... penalties" encompasses the power to impose a cap on punitive damages.
In that case that I fear will be filed within days of the release of this opinion, the majority of this Court must either reverse a precedent of over 138 years as to what right to trial by jury is protected by § 11 of the Constitution, see Tims v. State, supra, or, to be consistent with its holding in this case, hold that the legislature did not have the power under the Alabama Constitution to remove the right of the jury to sentence a defendant to death or imprisonment or to set finesand it must do this to protect punitive damages, which we have consistently held no one has a right to recover; and it must be done when the Constitution so specifically empowers the legislature to remit punitive damages and to fix the punishment for crimes.
According to statistics cited by the Chief Justice of this Court in an address to the May 1993 Alabama Bar admittees, there were only 54 cases in which punitive damages in any amount were awarded by juries in Alabama during the 1992 calendar year.[4] While this statistic may cause one to wonder if punitive damage awards need remitting, that has been decided by representative democracy, a concept of governance that has protected individual liberty since 1215 at Runnymede. However, viewed from my judicial vantage point, I wonder why the majority of this Court feels that it is one of the "felt necessities of our time" to strike this statute (disregarding our time-honored standards of review), when so few potential cases are involved and when the method of doing this may disrupt most of the cases decided in Alabama's criminal justice system during the last 12 years.
*908 This issue may not have been raised in most criminal cases, so there was no reason for this Court to reach it. However, in capital cases, this Court is required to search the record for error. If § 11 of the Alabama Constitution prohibited the legislature from divesting the jury of the right to impose the death sentence or a sentence of life imprisonment and empowering the trial court to do so, then why has the majority of this Court not recognized that as error when the trial court has set a sentence, sometimes even contrary to the jury's advisory opinion?
The concept of judicial review is a challenge. See Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414, 427-35 (Ala.1991) (Houston, J., dissenting); and Clark v. Container Corp. of America, Inc., 589 So.2d 184, 196-98 (Ala.1991). It is easy enough to follow and agree with Chief Justice John Marshall's pronouncement: "It is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). It is easy enough to follow and agree with the reasoning of Publius ("Publius" was Alexander Hamilton's nom de plume): "Where the will of the legislature declared in its statutes, stands in opposition to that of the people declared in the Constitution, the judges ought to be governed by the latter rather than the former." The Federalist, No. 78, at 294 (The Legal Classics Library, 1983). The difficulty lies in determining when a legislative statute "stands in opposition" to the Constitution.
It is even more essential in regard to the Alabama Constitution than it is in regard to the Federal Constitution to make certain that a legislative statute clearly "stands in opposition" to the Constitution before it is held to be unconstitutional by the judiciary, for not only is there a distribution of powers of government in Alabama (Art. III, § 42, Constitution), there is the expressed declaration of the people that "the judicial [department] shall never exercise the legislative and executive powers, or either of them; to the end that [our state government] may be a government of laws and not of men." (Art. III, § 43, Constitution).
It was perceived that the federal judiciary must never exercise "WILL" in striking down a duly enacted statute of the legislature, but that it must exercise only "JUDGMENT" when striking down such a statute (The Federalist, No. 78 at 295).
In Alabama, Supreme Court Justices should never exercise "WILL" in striking down a duly enacted statute of the legislature; we should, nay, we must, exercise only "JUDGMENT" when striking down such a statute. Supreme Court Justices exercise only judgment in determining the constitutionality of a statute by adhering to the established rules of constitutional construction and by declaring a statute unconstitutional only if doing so is necessary to prevent the legislature from violating a clear and paramount constitutional principle. See Judge Learned Hand, The Bill of Rights 14-29 (1958); see, also, Mayor of Mobile v. Stonewall Insurance Co., 53 Ala. 570 (1875). The judiciary should hold a duly enacted statute unconstitutional only when it finds a "neutral principle" that is independent of its view of the policies behind the duly enacted law. Herbert Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv. L.Rev. 1, 6 (November 1959). The judicial process must be genuinely principled and reach judgment on sound legal analysis and reasoning that transcends the immediate result that is reached. 73 Harv.L.Rev. 12, 15.
Therefore, before I can vote to invalidate a statute duly enacted by that body given the power by the people to enact that statute (the legislature) (Art. IV, § 44, Constitution) and approved by that official given the power by the people to veto that statute (the governor) (Art. V, § 125, Constitution), in short, when I vote against representative democracy, I must be able to articulate what clear and paramount constitutional principle the statute violates; and I must be principled enough to show by sound legal analysis and sound legal reasoning that the constitutionally challenged statute violates that clear and paramount constitutional principle. If I cannot do this, then it is I, a member of the judicial branch of government, and not the legislature or the governor, that "stands in *909 opposition" to the will of the people declared in the Constitution.
"That the great, general, and essential principles of liberty and free government may be recognized and established, we [the people of the State of Alabama] declare:
"....
"Section 11. That the right of trial by jury shall remain inviolate."
What clear and paramount right did Article I, § 11, of the Constitution of 1901, guarantee to the citizens of this state? Section 11 explicitly states "[t]hat the right of trial by jury shall remain inviolate." This Court, interpreting these words, has consistently held that the ratification of § 11 effected a "freezing" of the right of trial by jury as that right existed at common law or by statute in 1901. Stated differently, § 11 did not enlarge the right of trial by jury that existed in any individual when the Constitution was ratified. Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974).
What exactly, then, were an individual's rights vis-a-vis trial by jury before the ratification of the 1901 Constitution? This Court and the courts of appeals of this state have held that an individual, before the Constitution was ratified, had the right, in certain cases, to have a 12-person, impartial jury unanimously decide the facts. See Clark v. Container Corp. of America, Inc., supra, citing Gilbreath v. Wallace, supra; Kirk v. State, 247 Ala. 43, 22 So.2d 431 (1945); Baader v. State, 201 Ala. 76, 77 So. 370 (1917); Alford v. State ex rel. Attorney General, 170 Ala. 178, 54 So. 213 (1910); Tims v. State, 26 Ala. 165 (1855); Culbert v. State, 52 Ala.App. 167, 290 So.2d 235 (1974); Brown v. State, 45 Ala.App. 391, 231 So.2d 167 (1970); Dixon v. State, 27 Ala.App. 64, 167 So. 340 (1936), cert. denied, 232 Ala. 150, 167 So. 349 (1936); Judge Walter B. Jones, Trial by Jury in Alabama, 8 Ala.L.Rev. 274, 277 (1956); 16 Ruling Case Law 181 (1917). Of specific importance to this case is the fact that juries were allowed, in proper cases, to assess punitive damages at common law, L. Schleuter and K. Redden, Punitive Damages, § 1.3, at 12 (2d ed. 1989); and, indeed, punitive damages were awarded to the injured parties who brought suit. See, e.g., Rhodes v. Roberts, 1 Stew. 145, 146-47 (Ala.1827), where this Court, in affirming a $1,500 judgment against the defendant under a trespass theory, held:
"Where the injury is to the person of the plaintiff, the amount of damages cannot be measured by any certain and precise standard. The negligence may be very gross and reprehensible, and in all such cases the jury may give smart money, if in their view the circumstances are such as to require it."
(Emphasis added.) However, as Rhodes illustrates, even though juries were allowed to assess punitive damages at common law, and even though punitive damages were awarded to the injured parties who brought suit, punitive damages at common law were awarded for the sole purpose of vindicating and protecting society's (i.e., the public's) right to be free from certain kinds of egregious tortious conduct, not for the purpose of providing a private compensatory remedy. See e.g., Meighan v. Birmingham Terminal Co., 165 Ala. 591, 598-99, 51 So. 775, 777-78 (1910), wherein this Court stated:
"If conceivably a verdict for punitory damages might have been based upon these facts, we think the passage of the act of March 6, 1907, before the time of the trial, though subsequent to the infliction of the injury, ... had the effect to relieve defendant of liability for damages which it is assumed might otherwise have been assessed for the purpose of punishment. Such damages are assessed in proper cases in the interest of the state. They are awarded not for the compensation of the plaintiff, but as a warning to other wrongdoers. A plaintiff has no right to maintain an action merely to inflict punishment. Exemplary damages are in no case a right of the plaintiff, but are assessed at the discretion of the jury for the purpose indicated.... The state had the right to remit punitory damages, and by implication did so when it passed the act of ratification. That act could not, of course, have had effect in the way of divesting previously vested rights, and by its terms, out of abundance of caution merely, those rights were preserved. The plaintiff's right to *910 complete and adequate compensation for property taken or injured, including injury to his special right in the highway as a means of enjoying the free and convenient use of his abutting property, remained without impairment."
(Emphasis added.)
The idea that punitive damages are awarded solely for the purpose of vindicating and protecting society's interests by punishing those who engage in egregious tortious conduct and deterring them and others from engaging in such conduct in the future, and the idea that only an amount necessary to accomplish these goals may be awarded, have been restated many times since Meighan. See e.g., Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812, 837 (1988):
"Although not imposing the stigma of crime or the unique burdens of imprisonment, punitive damages nonetheless serve to place the defendant on notice that it has engaged in conduct considered intolerable by society and also serves to deter others from following the defendant's example. But in levying a punitive award, the degree or amount must be comparable to the act deserving punishment. And though the defendant has engaged in intolerable conduct, it does not surrender its right to `fair' punishment; in other words, `although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence.' Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), citing Maryland Casualty Co. v. Tiffin, 537 So.2d 469 (Ala.1988), City Bank of Alabama v. Eskridge, 521 So.2d 931 (Ala. 1988), and Roberson v. Ammons, 477 So.2d 957 (Ala.1985)."
Consequently, before the ratification of the 1901 Constitution, if the defendant was not shown to be guilty of the kind of egregious conduct that was contemplated by the common law as deserving of punishment, then the jury had no legal authority to award punitive damages. Furthermore, in cases involving egregious conduct, discretionary awards of punitive damages by juries were subject to post-judgment review by the courts under an abuse of discretion standard. Thus, the kind of discretion that juries were allowed to exercise at common law before the ratification of the 1901 Constitution was a limited discretion, which this Court has compared to the kind of "legal" discretion that is routinely exercised by courts. Coleman v. Pepper, 159 Ala. 310, 49 So. 310 (1909). Black's Law Dictionary 466-67 (6th ed. 1990), under "Discretion," defines "judicial and legal discretion," in pertinent part, as follows:
"These terms are applied to the discretionary action of a judge or court, and mean discretion bounded by the rules and principles of law, and not arbitrary, capricious, or unrestrained. It is not the indulgence of a judicial whim, but the exercise of judicial judgment, based on facts and guided by law, or the equitable decision of what is just and proper under the circumstances. It is a legal discretion to be exercised in discerning the course prescribed by law and is not to give effect to the will of a judge, but to that of the law.... A liberty or privilege to decide and act in accordance with what is fair and equitable under the peculiar circumstances of the particular case, guided by the spirit and principles of the law"....
(Emphasis added.)
It is clear, therefore, that before the ratification of the 1901 Constitution, an individual had the right in certain cases to have a jury make the factual determination as to whether punishment was necessary to protect society's interests and to have the jury award punitive damages if the jury was so inclined. This right received constitutional protection by virtue of § 11. However, it is equally clear that in performing its factfinding function before the ratification of the Constitution in 1901, the jury was always subject to the rule of law in exercising its discretion. The jury could award punitive damages only in those cases involving egregious tortious conduct on the part of the defendant, and any award made by the jury in such a case could not exceed an amount that would accomplish society's goals of punishment and deterrence. When the Constitution of 1901 was ratified, it was the right of an individual to have a jury *911 act as factfinder and to return a verdict in accordance with the rules of law applicable to the particular case that was afforded constitutional protection by § 11. Before the ratification of the 1901 Constitution, there was no legislative restriction on the exercise of a jury's discretion in awarding punitive damages, such as the one at issue in this case. In other words, the legislature had taken no steps to declare the maximum amount that could be awarded by the jury to vindicate and protect society's interests. It was the function of the court to declare what this amount was on a case-by-case basis and to order a remittitur if necessary. Although § 11 prohibited legislative interference with an individual's common law right to have a jury perform its historic factfinding function, § 11 did not confer upon an individual the right to have a jury perform this function in a vacuum, i.e., freed from the guidance or control of the law.
Section 6-11-21 represents a change in the law only in the sense that it declares the maximum amount that is allowable to accomplish society's goals of punishment and deterrence. Section 6-11-21 did not affect the discretionary authority that the jury had, before the ratification of the 1901 Constitution, to award punitive damages. The jury has never been allowed to award more than an amount deemed necessary by society to punish and deter. Who has the authority to determine the outer limits of punishment and deterrence? Those duly elected by a majority of Alabamians to make law, or 12 people randomly selected from driver's license records, who have survived challenges for cause, Batson challenges,[5] and peremptory challenges of attorneys for particular parties in a particular civil action? I have to believe that those duly elected, not those randomly selected, have the power to determine what is a maximum amount needed to punish and deter. When viewed from this perspective, it is clear that § 6-11-21 did not change the law, at least with respect to the extent of the jury's discretion to award punitive damages, and, therefore, that it does not violate § 11.
I began my dissent in Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414, 427 (Ala.1991), with a quote from the oral argument before the United States Supreme Court of Bruce J. Ennis, Esquire, arguing on behalf of the plaintiff/appellee, Ms. Haslip, in Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991): "I think this is a paradigmatic case for judicial restraint, not judicial activism."
In Armstrong, the majority of this Court deviated from our judicially prescribed standard of review to strike down portions of Ala.Code 1975, § 6-11-23, proclaiming that Armstrong presented a "unique situation." I described the action of the majority as "judicial activism at its worse." 581 So.2d at 427-28. I think that the majority, by its opinion in this case, is not adhering to at least three well-established rules of constitutional construction.
In Home Indemnity Co. v. Anders, 459 So.2d 836, 840 (Ala.1984), this Court, quoting Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944), held:
"`In determining whether the act is constitutional, we are bound by the following presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the Court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law.'"
This Court has also held that "[e]ach section of the Constitution must necessarily be considered in pari materia with all other sections," and that "[w]hen there is a conflict, or apparent conflict, between sections of the Constitution, the more specific will prevail as against a more general statement pertaining to the same subject matter." Jefferson County v. Braswell, 407 So.2d 115, 119 (Ala. 1981).
The legislature's power to regulate punitive damages is derived from two provisions in the Alabama Constitution. "The legislative power of this state shall be vested in a legislature" (Art. IV, § 44). "It is of course *912 well understood that the only authority which has the power to make State laws is the legislature. Section 44, Constitution." Personnel Board of Mobile County v. City of Mobile, 264 Ala. 56, 60-61, 84 So.2d 365, 369 (1955) (emphasis added). "Section 44 of the Constitution is the express constitutional provision for representative government." Opinion of the Justices No. 263, 379 So.2d 939, 940 (Ala.1980). "`It [representative government] is based on the concept that democratic government functions best through a written Constitution vesting the full legislative power in representatives chosen by the people....'" Opinion of the Justices No. 201, 287 Ala. 321, 323, 251 So.2d 739, 741 (1971) (quoting Opinion of the Justices No. 36, 232 Ala. 56, 166 So. 706 (1936)).
As previously discussed, according to the plain wording of Art. IV, § 104(28), the legislative department of government has the power to "remit ... penalties," if it does so by general law. Section 6-11-21 is a general law. "Penalty" includes punitive damages. "Remit" means to "give up" or "reduce." "The state had the right to remit punitory damages ...," Meighan, 165 Ala. at 599, 51 So. at 778, if it did so by a general law, which § 6-11-21 is.
All Justices agree that no citizen has a right to recover punitive damages; therefore, there is no life, liberty, or property interest of a plaintiff involved where punitive damages are concerned. State ex rel. Galanos v. Mapco Petroleum, Inc., 519 So.2d 1275, 1277 (Ala.1987), stands for the proposition that if two provisions of the Constitution are seen to conflict and one of them is contained in Art. I, the Declaration of Rights, the provision from the Declaration of Rights will prevail. State ex rel. Galanos specifically involves § 35, "Objective of Government." This has paramountcy among constitutional provisions:
"[T]he sole and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when government assumes other functions it is usurpation and oppression."
Government includes the judiciary:
"The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."
Section 42, Constitution. (Emphasis added.)
Since we all agree that a plaintiff has no life, liberty, or property interest in an award of punitive damages, the only legitimate end of government in connection with the issue of punitive damages is to protect a defendant's property interest in not having to pay punitive damages that would exceed government's goal of punishment and deterrence. I believe that government, in its legislative capacity, set society's goal of punishment and deterrence by enacting § 6-11-21. Whether this was wise or needed is not for the judiciary to say, because the legislature was not prohibited by the Constitution from enacting § 6-11-21. Not only was the legislature not prohibited from enacting § 6-11-21, it was expressly empowered to do so by the Constitution (§ 104(28)). I believe that government, in its judicial capacity, as represented by the majority opinion in this case has assumed functions other than protecting "the citizen in the enjoyment of life, liberty, and property" when it strikes down § 6-11-21 as violating § 11 of the Constitution.
From what reservoir of strength for denying the legislature its constitutional power to make laws and to remit penalties does the majority draw? I shall discuss Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala. 1991), later, for Justice Adams, the author of the majority opinion in Moore, writes in the majority opinion in this case, "A fair reading of Moore reveals that its holding rested on this principle." At 887. It is that "principle" that I address firstthe "principle" on which, according to the author of Moore v. Mobile Infirmary Ass'n, the holding in Moore rested. If that "principle" is wrong, then, a fortiori, Moore is wrong.
The majority relies on Alabama Power Co. v. Rembert, 282 Ala. 5, 208 So.2d 205 (1968); Treadwell Ford, Inc. v. Leek, 272 Ala. 544, 133 So.2d 24 (1961); and Lehigh Portland Cement Co. v. Sharit, 234 Ala. 40, 173 So. 386 *913 (1937), to establish the "principle" upon which Moore and the majority opinion in this case rest.
Because the jury was instructed in those cases that it "should" assess punitive damages or that the plaintiff would be entitled to punitive damages if the defendants were guilty of wantonness, this Court reversed for failure to leave the assessment to the discretion of the jury. The majority opinion in this case makes this quantum leap, which cannot be made in keeping with those three opinions: it concludes that "if the jury's discretion was unconstitutionally impaired by these instructions, which, in effect, directed the jury to award punitive damages, then a fortiori, a statute interdicting such damages is patently impermissible." At 886 (emphasis original).
The majority gives those three cases constitutional underpinnings, which they do not have. In those cases the trial court improperly instructed the jury as to the law of punitive damages as it existed. Those cases do not stand for the proposition that the law of punitive damages cannot be changed by the legislature to set the outer bounds of society's goals of punishment and deterrence. In fact, dicta in those cases clearly indicate that the law of punitive damages can be changed to remove unbridled jury discretion.
"Punitive damages are not recoverable as a matter of right except as provided by statute...," Alabama Power Co. v. Rembert, 282 Ala. at 6, 208 So.2d at 206; "Punitive damages are not recoverable as a matter of right except as provided by the statute ...," Treadwell Ford, Inc. v. Leek, 272 Ala. at 546, 133 So.2d at 25; "Punitive damages are not recoverable as a matter of right except as provided by the statute." Lehigh Portland Cement Co. v. Sharit, 234 Ala. at 43, 173 So. at 388. (Emphasis added in each quote.)
In the name of jurisprudence, what does "except as provided by statute" in each of the three cases (Rembert, Leek, and Sharit) mean except that the legislature by statute could make punitive damages recoverable as a matter of rightthat the legislature had the power to change the jury's unbridled discretion in regard to punitive damages?
In Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 157 (Ala.1991), punitive damages were not awarded by the jury, and it was my understanding that punitive damages were in no way involved. My disagreement with the rationale of the Court's opinion, and my opinion concurring in the result, were based upon this understanding.
Other cases quoted by the majority as support for its faulty premises are Fuller v. Preferred Risk Life Ins. Co., 577 So.2d 878 (Ala.1991), and Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729 (1886). The per curiam opinion in Fuller relies on Barry v. Edmunds as authority for the portion of Fuller quoted in the majority opinion. See 577 So.2d at 884. The extensive quote from Barry is founded upon its quote from Mr. Justice Story for the following: "that a verdict will not be set aside in a case of tort for excessive damages `unless the court can clearly see that the jury have [here are set out in the alternative the things that can be considered, concluding with] or have totally mistaken the rules of law by which the damages are to be regulated'that is `unless the verdict is so excessive or outrageous' with reference to all the circumstances of the case `as to demonstrate that the jury have acted against the rules of law....'" 116 U.S. at 565, 6 S.Ct. at 509. (Emphasis added.) Further, the per curiam opinion in Fuller states, immediately after citing Barry v. Edmunds, supra: "That authority [the authority of the jury to set the amount of punitive damages] is not diminished by post-verdict review of the verdict by the trial court. Trial courts were assigned that function at common law." 577 So.2d at 884. Likewise, that authority (the authority of the jury to set the amount of punitive damages) is not diminished by a statutory change in the law of punitive damages, for Parliament was permitted to statutorily change the common law. 5 Macaulay, The History of England from the Accession of James II (Aldine Book Publishing Co.) 478; 15A Am.Jur.2d Common Law § 8, 593, 605 (1976); see Manoukian v. Tomasian, supra.
The majority clearly bases its decision on Alabama law: "[O]ur conclusions regarding the constitutionality of § 6-11-21 are based entirely on adequate and independent state *914 law grounds." At 885. It is questionable why so much of the opinion is a quote from Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729 (1886), which did not involve Alabama law. However, it is to the majority's credit that it does base its decision on Alabama "law," because it certainly is not supported by decisions of the United States Supreme Court, including Barry v. Edmunds.
Justice Scalia, in his concurrence in the judgment in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 39, 111 S.Ct. 1032, 1054, 113 L.Ed.2d 1 (1991), wrote: "State legislatures and courts have the power to restrict or abolish the common-law practice of punitive damages...." Except in Alabama, from whence came Pacific Mutual v. Haslip.
The majority of the United States Supreme Court in Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 88, 98 S.Ct. 2620, 2638, 57 L.Ed.2d 595 (1978), also shared Justice Scalia's view; the following appeared in footnote 32:
"Our cases have clearly established that `[a] person has no property, no vested interest, in any rule of the common law.' Second Employers' Liability Cases, 223 U.S. 1, 50, 32 S.Ct. 169, 175, 56 L.Ed. 327 (1912), quoting Munn v. Illinois, 94 U.S. 113, 134, 24 L.Ed. 77 (1877). The `Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object,' Silver v. Silver, 280 U.S. 117, 122, 50 S.Ct. 57, 58, 74 L.Ed. 221 (1929), despite the fact that `otherwise settled expectations' may be upset thereby. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). See also Arizona Employers' Liability Cases, 250 U.S. 400, 419-422, 39 S.Ct. 553, 555-556, 63 L.Ed. 1058 (1919). Indeed, statutes limiting liability are relatively commonplace and have consistently been enforced by the courts. See, e.g., Silver v. Silver, supra (automobile guest statute); Providence & New York S.S. Co. v. Hill Mfg. Co., 109 U.S. 578, 3 S.Ct. 379, 27 L.Ed. 1038 (1883) (limitation of vessel owner's liability); Indemnity Ins. Co. of North America v. Pan American Airways, 58 F.Supp. 338 (SDNY 1944) (Warsaw Convention limitation on recovery for injuries suffered during international air travel). Cf. Thomason v. Sanchez, 539 F.2d 955 (CA3 1976) (Federal Driver's Act)."
It is not necessary to address the other cases cited by the majority. Suffice it to say that none of them stands for the proposition that punitive damages are above the law.
As a result of the majority's opinion, if a case is tried to a jury, then § 6-11-21 ("[a]n award of punitive damages shall not exceed $250,000") is unconstitutional. However, if the trial court is the trier of the facts, then punitive damages cannot exceed $250,000 unless the punitive damages award is based on one of the three exceptions listed in § 6-11-21, because clearly what the trial court does as trier of the facts is in no way affected by § 11 of the Constitution. This anomaly results from the majority's unprecedented myopic view of § 11 of the Constitution.
The people spoke through their legislature in 1987. The people spoke after all sides had been heard. The best and the brightest advocated or opposed a fixed limitation on punitive damages. What is now § 6-11-21 was legally adopted by a duly elected legislature, and it was approved by a duly elected governor. This was representative democracy at work. If excessiveness of a punitive damages award is raised, should not I, as an appellate court judge, treat $250,000 as the outer limit of what society deems necessary in the way of punishment and deterrence for civil wrongs (except those for which the limit was not made applicable). As the author of Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), I believe that a $250,000 limitation should be factored into the Green Oil Co. standard of review. The legislature can by general act change rules adopted by this Court. Section 6.11, of Amendment 328, Alabama Constitution.
"And still when Mob or [a Court] lays Too rude a hand on English ways, The whisper wakes, the shudder plays, Across the reeds at Runnymede.
And Thames, that knows the moods of kings, And crowds and priests and such like things,
Rolls deep and dreadful as he brings Their warning down from Runnymede!"
Rudyard Kipling, The Reeds of Runnymede (1911).
*915 STEAGALL, JUSTICE (dissenting).
I respectfully dissent from Part I of the majority opinion. I would hold that there was not sufficient evidence to support the jury's award of punitive damages. I also respectfully dissent from Part II of the opinion, which holds that the legislation placing a cap on punitive damages is unconstitutional. See my dissent in Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991).
NOTES
[1] This proposition was tacitly anticipated in Owens v. Grant, 569 So.2d 707 (Ala.1990), where we noted: "The court instructed the jury on negligence and wantonness as set forth in Restatement (Second) of Torts § 339 (1986), and the jury returned a verdict in the amount of $125,000 against Owens." 569 So.2d at 709-10. (Emphasis added.) The judgment was reversed, however, because the trial judge had refused to submit to the jury the question of the applicability of Ala.Code 1975, § 35-15-1 et seq., as a defense to the action.
[2] Additionally, the net inference derived from balancing the "utility ... of maintaining the condition and the burden of eliminating the danger," § 339(d), may be an aggravating or mitigating factor, depending on the circumstances.
[3] One path led from Cedar Knoll to a playground area known as Bowers Park, and the other path connected Cedar Knoll to Idlewood.
[4] Moreover, under the evidence presented in this case, the jury was warranted in rejecting APCo's contention that the tower held a warning sign at the time of the accident.
[5] This Court set forth a portion of the same passage from Day v. Woodworth in South & North Alabama R.R. v. McLendon, supra, 63 Ala. at 274.
[6] See also Birmingham Electric Co. v. Shephard, 215 Ala. 316, 110 So. 604 (1926); Cox v. Birmingham Ry., Light & Power Co., 163 Ala. 170, 50 So. 975 (1909); and Coleman v. Pepper, 159 Ala. 310, 49 So. 310 (1909).
[7] In this connection, it is with amazement that we read in Justice Houston's dissent the implication that by virtue of this opinion, "punitive damages are above the law." At 914. This assertion is utterly unsupported by our decision, which merely re-establishes the judiciary's common law role in reviewing jury verdicts under factors such as those set forth in Green Oila case authored by Justice Houston himself. In other words, instead of a jury's award being limited by an arbitrary cap of $250,000, regardless of the reprehensibility of the defendant's conduct, each case is treated individually to ensure that no award is too little or too great. Not only does the jury initially perform this function, but the result is reviewed by the trial judge and, finally, by this Court under principles set forth in Green Oil, authored by Justice Houston.
[8] Why did the Supreme Court mention the "cap" statute when discussing the Alabama scheme for limiting jury discretion in order to comport with federal "due process" requirements? By mentioning the effective date of § 6-11-21, did the Court suggest that had the Act been applicable in Haslip, it would have applied it? The footnote, in view of its inclusion in the opinion, seems to suggest that.
[9] In Haslip, the Supreme Court noted that "[t]his Court and individual Justices thereof on a number of occasions in recent years have expressed doubts about the constitutionality of certain punitive damages awards." 499 U.S. at 9, 111 S.Ct. at 1038.
[10] In General Motors Corp. v. Edwards, 482 So.2d 1176 (Ala.1985), this Court discussed at length remittitur practice in Alabama, and although the Court was divided on whether to affirm the trial court's remittitur order in that case, the Court seemed to recognize that some procedures and standards should be adopted for reviewing claims of excessiveness. In Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), this Court set out the standards that now govern trial courts in reviewing such awards, which the United States Supreme Court, in Haslip, found guaranteed sufficient due process in that case, but as I have already pointed out, the Supreme Court cited the act struck down today as according a measure of due process for future cases in which punitive damages were awarded.

In Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), the United States Supreme Court was called upon to address the question of whether Alabama's procedure of allowing juries a standardless discretion in awarding punitive damages, which the Court today approves, violated due process under the United States Constitution. Although the Court did not address the constitutionality of the award in that case, the Court did indicate that it would address the federal constitutional issue when it was properly presented. It was against this background of concern about the excessiveness of jury awards that the Alabama legislature adopted this act, as part of the "Tort Reform Package." Consequently, I think that the Supreme Court's reference in Haslip to this act, albeit in a footnote, has some federal constitutional significance.
[11] In Pickett, this Court held that the legislature had the power to abolish a cause of action entirely, and not merely the power to limit the recovery in an action. This Court reaffirmed that principle as recently as last term in Northeast Utilities, Inc. v. Pittman Trucking Co., 595 So.2d 1351, 1354 (Ala.1992). The first aberration of this principle seems to have come when a majority of this Court struck down a legislative act in Grantham v. Denke, 359 So.2d 785 (Ala.1978). When this Court decided Reed v. Brunson, 527 So.2d 102 (Ala.1988), I thought the question of legislative power had been settled, whether it was challenged under § 11 or § 13, unless the substantive right to a trial by jury was at issue.

I recognize that a majority of this Court might disagree with Pickett, but some Justices that I believe as among the best ever to serve on this Court concurred in the opinion. I think Pickett correctly interpreted the proper role of this Court when construing an act of the legislature and is still sound in interpreting the plenary power of the legislature.
[12] In 1901, of course, the plaintiff here would not have been allowed to sue because this Court did not recognize a cause of action in cases such as this until 1976, when it decided Tolbert v. Gulsby, 333 So.2d 129 (Ala.1976).
[13] Courts have traditionally had the power to review jury verdicts for excessiveness and to grant remittiturs. That power has been statutorily granted in some instances. See Ala.Code 1975, § 12-22-71. I thought that the review procedures that the legislature adopted were designed to comport with federal and state requirements regarding review of claims of excessiveness.
[14] The fact that the Supreme Court cited the act that the majority strikes down today, when considered along with the fact that the question of legislative caps was discussed at the oral arguments in Haslip, a case in which the issue involved the excessiveness of a jury award of punitive damages, leads me to conclude that the Supreme Court attached some significance to the legislature's having placed a cap on punitive damages.

During oral arguments in Pacific Mutual Life Ins. Co. v. Haslip, the following exchange between the Court and Mr. Ennis, attorney for Haslip, occurred:
"QUESTION: Well, what isis thereis there some due process requirement that the punitive damages not be excessive?
"MR. ENNIS: Yes, Your Honor, I think that there are decisions of this Court that do impose an outer limit, regardless of the fairness of the standard of procedure.
"QUESTION: What, there's not a limit like, excessive?
"MR. ENNIS: The outer limit would be, under the substantive component of the due process clause
"QUESTION: Yes?
"MR. ENNIS: that the punitive award not exceed an amount that would rationally further the State's legitimate objectives.
"Now, in this case, I think that there can be no serious argument that this award violates that standard, for the simple reason
"QUESTION: And you say this excessiveness comes out of the due process clause, thisyou say? How does it do that? You say thatI thought you started out saying the due process clause just doesn't read on punitive damages?
"MR. ENNIS: I think that the due process clause does not apply to whetherto predictability of the amount of the punitive damage award. I think that's right.
"QUESTION: But it does apply, you sayit can be too great?
"MR. ENNIS: There is, perhaps, a substantive component of the due process clause.
"QUESTION: Well, you said there was a while ago."
In his closing remarks, Mr. Ennis said:
"MR. ENNIS: Let me simply conclude, since my time is almost to expire, by saying that the principal issue here I think is the standards issue. I think that Alabama has developed a rational system for achieving legitimate and very important State objectives. Alabama provides substantially more protection than the common law standards that were well established when the due process clause was adopted and that are still the prevailing standards today.
"This Court should not expand upon that traditional understanding of due process and throw settled State tort law into complete disarray without compelling evidence that the punitive damage awards are fundamentally unfair in the majority of cases, and without compelling reason to believe that the legislative process is closed or is incapable of addressing that problem." (Emphasis added.)
The above excerpts from the oral arguments in Haslip are taken from a transcript of those arguments prepared by Alderson Reporting Company, Inc., Washington, D.C. 20005.
[15] Because of what the United States Supreme Court had held in other cases involving federal constitutional claims, I thought that the Supreme Court would decide Haslip differently. See Pacific Mutual Life Insurance Co. v. Haslip, 553 So.2d 537, 544 (Ala.1989) (Maddox, J., dissenting). See also Southern Life & Health Ins. Co. v. Turner, 586 So.2d 854, 859-61 (Ala.1991) (Maddox, J., concurring in the result). Because my prediction of what the Supreme Court would do in Haslip was misplaced, I shall await its decision in the case now before it. I have no way of knowing how the United States Supreme Court would view the holding in this case if this Court's holding is challenged, but I believe that the Supreme Court would be interested in knowing that this Court raised the § 11 arguments on its own in Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991).
[1] Rudyard Kipling, The Reeds of Runnymede (1911).
[2] The original opinion in Ex parte Coker was released on December 7, 1990, and, on application for rehearing, an extension to that opinion was released on January 11, 1991. Ex parte Coker, 575 So.2d 43 (Ala.1990).
[3] "British statutes antedating the Declaration of Independence have almost universally been regarded as having the effect of judicial precedent, rather than legislative enactment. `The common law of the mother country as modified by positive enactments, together with the statute laws which are in force at the time of the emigration of the colonies, becomes in fact the common law rather than the common and statute law of the colony.'"
[4] Of these, 42 cases involved punitive damages of $250,000 or less; 2 cases involved punitive damages in the range between $250,001 to $1,000,000; and 10 cases involved punitive damages of $1,000,000 or higher. Of the 54 cases in which punitive damages were awarded, 33 cases involved jury awards and 16 involved awards made by a trial court.
[5] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).